**Appeal No. 2013-1176**

# In The United States Court of Appeals For The Federal Circuit

INTERNATIONAL CUSTOM PRODUCTS, INC.,

*Plaintiff-Appellee,*

—v.—

UNITED STATES,

*Defendant-Appellant.*

On Appeal from the United States Court of International Trade
in Case No. 07-CV-0318, Hon. Gregory W. Carman, Judge

## BRIEF FOR APPELLANT, THE UNITED STATES

STUART F. DELERY
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

BARBARA S. WILLIAMS
Attorney in Charge
International Trade Field Office

EDWARD F. KENNY
JASON M. KENNER
Trial Attorneys
Civil Division, Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
Tel. No. (212) 264-9230 or 0480
*Attorneys for Defendant-Appellant*

*Of Counsel:*

YELENA SLEPAK
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUES…………………………………………………..1

STATEMENT OF THE CASE……………………………………………………….2

STATEMENT OF THE FACTS ………………………………………………...2

SUMMARY OF THE ARGUMENT……………………………………………..11

ARGUMENT…………………………………………………………………..13

    I.      STANDARD OF REVIEW ON APPEAL…………………………13

    II.    NO GROUNDS EXIST TO EXPAND 19 U.S.C. § 1625(c) TO COVER NOTICES OF ACTION………………………………...13

          A.     The Liquidation Process………………………………...14

          B.     Congress Intended That Rulings And Other Policy Directives Be Subject To Notice And Comment Under 19 U.S.C. § 1625(c)…………………………………..18

          C.     The Undisputed Evidence Establishes That The Notice Of Action Was Not A *De Facto* Or Effective Revocation Of NYRL D86228…………………………………………….32

          D.     Expanding 19 U.S.C. § 1625(c) To Cover Non-Interpretive Decisions Is Particularly Unwarranted Since ICP Knew Of The Correct Cause Of Action And Yet Refused To Pursue It……………………………………………………35

CONCLUSION…………………………………………………………...…38

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

American Air Parcel Forwarding Company, Ltd. v. United States,
    2 Fed. Cir. 1, 718 F.2d 1546 (1983)…………………………………………37

Bauerhin Technologies Limited Partnership v. United States,
    110 F.3d 774, 776 (Fed. Cir. 1997)…………………………………………..13

California Industrial Products, Inc. v. United States,
    436 F.3d 1341 (Fed. Cir. 2006)…………………………………………...20, 21

Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.,
    467 U.S. 837 (1984)…………………………………………………………..18

Consumers Union of United States, Inc. v. Veterans Administration,
    301 F. Supp. 796 (S.D.N.Y. 1969)…………………………………………22

Dart Export Corp. v. United States,
    43 CCPA 64 (CCPA 1956)………………………………………………...30

DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades  Council,
    485 U.S. 568 (1988)…………………………………………………………..19

Dow Chem. Co. v. United States,
    10 CIT 550, 647 F. Supp. 1574 (1986)…………………………………….30

Employers Reinsurance Corp. v. Teague,
    No. 91-2299, 1992 WL 200868 (4th Cir. 1992)…………………………….22

Houbigant, Inc. v. Federal Ins. Company,
    374 F.3d 192 (3rd Cir., 2004)…………………………………………………22

International Custom Products v. United States,
    878 F.Supp.2d 1329 (Ct. Int'l Trade 2012)……………………………...2, 10

ii

International Custom Products v. United States,
32 CIT 302, 549 F.Supp.2d 1384……………………………………..5, 10

International Custom Products, Inc. v. United States (ICP I),
Court No. 05-00341…………………………………………………6, 8

International Custom Products, Inc. v. United States (ICP IV),
Court No. 07-00318………………………………………………8

International Custom Products, Inc. v. United States,
374 F. Supp. 2d 1311 (CIT 2005),
*rev'd in part*, *vacated in part*, 467 F.3d 1324 (Fed. Cir. 2006)……………..6

Medline  Industries v. United States,
62 F.3d 1407 (Fed. Cir. 1995)…………………………………………...13

Timex V.I., Inc. v. United States,
157 F.3d 879 (Fed. Cir. 1998)…………………………………………...20

Trans-Pacific Policing Agreement v. U.S. Customs Service,
177 F.3d 1022 (D.C. Cir. 1999)…………………………………………27

United States v. Utex Int'l, Inc.,
857 F.2d 1408 (Fed. Cir. 1988)…………………………………………30

Watkins v. United States,
No. 02 C 8188, 2003 WL 1906176 (N.D. Ill. April 17, 2003)…………….22

**Statutes and Regulations**

Harmonized Tariff Schedules of the United States,

Subheading 0405.20.30………………………………………………...3, 5

Subheading 2103.90.90………………………………………………...3

19 U.S.C.    § 1484………………………………………………………..14

§ 1505(a)……………………………………………………………14

§ 1514(a)………………………………………6, 12, 17, 29, 31, 37

§ 1581(h)……………………………………………………………...6

§ 1625………………………………………………18, 19, 20, 25

§ 1625(a)……………………………………………...19, 20, 21, 25

§ 1625(c)………………………………………………….*passim*

§ 1625(c)(1)……………………………………………………*passim*

§ 1625(c)(2)……………………………………………………...7

28 U.S.C.    § 1581(a)…………………………………...6, 9, 11, 17, 36, 37

§ 1581(i)……………………………………………………………6

19 C.F.R.    § 152.2…………………………………….4, 15, 26, 31, 33, 35

§ 159.1……………………………………………………...5, 16, 29

§ 159.2……………………………………………………...5, 16, 29

§ 174.12……………………………………………………6, 17, 31

§ 174.23…………………………………………………………...17

§ 177.1(d)(1)…………………………………………………...15

§ 177.8……………………………………………………………15

§ 177.9………………………………………………9, 12, 15, 32, 36, 37

§ 177.10(a)……………………………………………………...16

§ 177.11……………………………………………………………...16

§ 177.12……………………………………………………………...15

**Miscellaneous**

USCIT R. 12(b)(5)………………………………………………………8

H. Rep. No. 103-361-I………………………………………………...24, 25

103 S. Rpt. No. 189……………………………………………………..24

HQ 967780……………………………………………………………..7, 34

NYRL D86228………………………………………………………*passim*

North American Free Trade Agreement Implementation Act…………………..…24

## STATEMENT OF JURISDICTION PURSUANT TO RULE 28(a)(4)

a.      The United States Court of International Trade had jurisdiction over this case, which involves a challenge to a denied protest to U.S. Customs and Border Protection's classification of an entry of goods at liquidation, pursuant to 28 U.S.C. § 1581(a).

b.      This Court has jurisdiction of this appeal from a final decision of the United States Court of International Trade, pursuant to 28 U.S.C. § 1295(5).

c.      The judgment of the United States Court of International Trade was entered on November 20, 2012.  The notice of appeal in this case was filed on January 18, 2013, and is timely under 28 U.S.C. §§ 2107 and 2645(c), and Fed. R. App. P. 4(a)(4).

d.      This appeal is from a final judgment that disposed of all parties' claims.

## STATEMENT PURSUANT TO RULE 47.5

In accordance with Rule 47.5 of the Rules of the United States Court of Appeals for the Federal Circuit, counsel for defendant/appellant makes the following statement:

(1)    To our knowledge no other appeal in, or from, the civil action brought before the United States Court of International Trade was previously before this, or any other appellate court under the same or similar title.

(2)    There is one case which involves similar issues of fact or law pending in the Court of International Trade that will be directly affected by this Court's decision in the pending appeal.  *United States v. Great American Insurance Company of New York, Surety for International Custom Products, Inc.*, United States Court of International Trade Court No. 13-0212.  (While another action pending before the Court of International Trade, *International Custom Products v. United States*, United States Court of International Trade Court No. 08-00189, ostensibly asserts similar causes of action, plaintiff-appellant failed to satisfy mandatory subject matter jurisdictional requirements, and a motion to dismiss is pending.)

Counsel for defendant/appellant is unaware of any cases which involve similar issues of fact or law pending in this Court that will directly affect or be directly affected by this Court's decision in the pending appeal.

Appeal 2013-1176

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT
_____

INTERNATIONAL CUSTOM PRODUCTS, INC.,

Plaintiff/Appellee,

v

UNITED STATES,

Defendant/Appellant.
_____

On Appeal from the United States Court of International Trade in Case No. 07-CV-0318, Hon. Gregory W. Carman, Judge

**BRIEF FOR APPELLANT, THE UNITED STATES**

**STATEMENT OF THE ISSUES**

Whether the Court of International Trade erred when it determined that a courtesy Notice of Action issued by U.S. Customs and Border Protection (Customs), warning of an advance in duty rate at an upcoming liquidation of a specific entry, was an interpretive policy type decision within the meaning of 19 U.S.C. 1625(c)(1),[1] requiring public notice and comment.

_____

[1] 19 U.S.C. § 1625(c) provides that:

A proposed interpretive ruling or decision which would-

## STATEMENT OF THE CASE

This challenges the Court of International Trade's decision and judgment in

*International Custom Products v. United States*, 878 F.Supp.2d 1329 (Ct. Int'l

Trade 2012) Joint Appendix (A) 1-53, holding that Customs violated 19 U.S.C. §

1625(c)(1) by issuing a courtesy Notice of Action without conducting public notice

and comment.

## STATEMENT OF THE FACTS

The factual background of this case dates back many years.  Plaintiff-

appellee International Custom Products, Inc. (ICP) was an importer and distributor

---

(1) modify (other than to correct a clerical error) or
revoke a  prior interpretive ruling or decision which has
been in effect  for at least 60 days; or

(2) have the effect of modifying the treatment previously
accorded by the Customs Service to substantially
identical  transactions;

shall be published in the Customs Bulletin.  The
Secretary shall give interested parties an opportunity to
submit, during not less than the 30-day period after the
date of such publication, comments on the correctness of
the proposed  ruling or decision.  After consideration of
any comments received, the Secretary shall publish a
final ruling or decision in the Customs Bulletin within 30
days after the closing of the comment period.  The final
ruling or decision shall become effective 60 days after
the date of its publication.

primarily of dairy based ingredients located in DuBois Pennsylvania.  On December 21, 1998, ICP requested a tariff classification ruling from Customs for the proposed importation of a product it called "white sauce."  On January 20, 1999, based solely upon the information supplied by ICP, including ICP's assertions of how its product was used, Customs issued New York Ruling Letter (NYRL) D86228, classifying ICP's product in subheading 2103.90.90, Harmonized Tariff Schedules of the United States (HTSUS), covering sauce preparations, at the rate of 6.6 percent *ad valorem*.  ICP then began importing a good, invoicing it as "white sauce," pursuant to NYRL D86228.

Years later, Customs learned that the goods actually being imported by ICP was not white sauce, but essentially a form of butter, properly classified as "dairy spread" under subheading 0405.20.30, a provision that imposes duties approximately 2,400 percent greater than the provision covering sauce preparations.  Customs' Philadelphia Service Port, the port where ICP's dairy spread was being entered, began working with U.S. Immigration and Customs Enforcement to determine whether ICP's conduct was criminal.  A252.  The port also forwarded its concerns to the National Import Specialist (NIS), essentially Customs' in-house substantive classification experts.  A250.  The NIS forwarded his concerns regarding the validity of NYRL D86228 to Customs' headquarters,

the Office of Regulations and Rulings (OR&R), the Customs office responsible for issuing and revoking most Customs rulings.  A277-279.

The record is clear that OR&R determined that NYRL D86228 was proper regarding the good it described, and should not be revoked.  A112.  Rather, ICP was importing merchandise materially different from that described in ICP's ruling, particularly, and critically, in its use.  A112.  The record is also clear that, consequently, because the actual imported dairy spread and the goods described by the ruling were materially different, OR&R determined that the ruling did not need to be revoked; it simply did not cover ICP's merchandise.  A269-273.  OR&R notified the NIS that the ruling remained effective.  *Id*.

In keeping with OR&R's findings and statutory and regulatory procedures, the port then found that a Notice of Action under 19 C.F.R. § 152.2, should be issued.[2]  A269-272.  Because of the large amount of money involved, headquarters for the port, Office of Field Operations (OFO), was alerted about the forthcoming Notice of Action.  A269-273.  On April 18, 2005, the port sent the Notice of Action under 19 C.F.R. § 152.2, to ICP informing it that 86 entries of ICP's white

---

[2]  If the relevant Customs port does not agree with the importer's claimed classification or appraisement, the port has several options, including issuing a Notice of Action.  A Notice of Action is a courtesy notice to that importer that upon the upcoming liquidation of that individual entry, its duty rate will be increased.  It is issued only pursuant to 19 C.F.R. § 152.2.

4

sauce would be classified at liquidation under subheading 0405.20.30, HTSUS, as dairy spread.[3]  A1366.

In short, the undisputed evidence establishes that Customs followed all proper procedures.  The record shows that the NIS properly raised his concerns with OR&R, and OR&R considered the NIS's views.  OR&R then notified the NIS and the port that revocation of NYRL D86228 was inappropriate because NYRL D86228 was correct for the set of circumstances described.  Since ICP's dairy spread materially differed from that described in NYRL D86228, the ruling was valid, but inapplicable to the instant importations.  A112, 269-273, 279.

On May 6, 2005, 60 out of the 86 entries listed in the Notice of Action were liquidated.[4]  The other entries remained unliquidated.  Without protesting the 60

---

[3]  All of these facts are undisputable from the record.  Nevertheless, the trial court confused these facts, and somehow concluded Customs as a whole has a free-wheeling discussion, leading to a decision to improperly revoke NYRL D86228.  *See International Custom Products v. United States*, 32 CIT 302, 549 F.Supp.2d 1384, 1392 and n. 7, the trial court's decision on the Government's motion to dismiss.  It appears the trial court significantly misunderstood the roles of the NIS or O&R, or failed to view the record in chronological order.  The trial court's version of events is unsupported by the record, and must be rejected as a matter of law.

[4]  Liquidation is Customs' final determination (based upon the entry papers, relevant rulings, and other information, if necessary), of the HTSUS subheading in which the importation is properly classified and assesses the correct amount of duty.  19 C.F.R. § 159.1, 19 C.F.R. § 159.2.

liquidations,[5] ICP filed its first action before the United States Court of International Trade on May 9, 2005, *International Custom Products, Inc. v. United States*, Court No. 05-00341 (*ICP I*), asserting jurisdiction under 19 U.S.C. § 1581(h), and challenging the validity of the Notice of Action as to the 86 listed entries.  The essence of the allegations in the complaint was that Customs had improperly revoked ICP's advance ruling under 19 U.S.C. § 1625(c) by issuing the Notice of Action.

The trial court dismissed ICP's jurisdictional basis as pled in its complaint, and *sua sponte* found jurisdiction under 28 U.S.C. § 1581(i).  The trial court also found for ICP on the merits of its 19 U.S.C. § 1625(c)(1) claim.  *International Custom Products, Inc. v. United States*, 374 F. Supp. 2d 1311 (CIT 2005), *rev'd* in part, vacated in part, 467 F.3d 1324 (Fed. Cir. 2006).  We appealed on two bases: first, jurisdiction under 28 U.S.C. § 1581(i) was improper; and, secondly, a Notice of Action was not the type of document that could trigger 19 U.S.C. § 1625(c).  This Court reversed *ICP I*, holding that jurisdiction under 28 U.S.C. § 1581(i) did

---

[5]  If an importer disagrees with any aspect of the liquidation, it must file a "protest" with Customs.  19 C.F.R. § 174.12; 19 U.S.C. § 1514(a).  Customs reviews the protest, and may grant or deny it.  If Customs denies the protest, the importer may commence an action with the United States Court of International Trade under 28 U.S.C. § 1581(a) challenging the denied protest of the liquidation.

not exist. *Id*. The Court vacated the remainder of the decision regarding the trial court's substantive determination on ICP's 19 U.S.C. § 1625(c)(1) claim. *Id*.

At approximately the same time, Customs proposed the revocation of NYRL D86228 in full compliance with 19 U.S.C. § 1625(c)(1), in a properly published notice on August 24, 2005. After examination of comments, Customs determined that the classification of ICP's goods were incorrect in NYRL D86228, and published a revocation (HQ 967780) of NYRL D86228 on November 2, 2005, with an effective date, in compliance with 19 U.S.C. § 1625(c)(1), of January 2, 2006. Consequently, until January 2, 2006, Customs considered NYRL D86228 an un-revoked ruling.[6]

Customs next forwarded another courtesy Notice of Action to ICP on May 24, 2007, in which Customs notified ICP that in upcoming liquidations of previously made entries, such as Entry No. 180-0590029-7 and other warehouse entries dating from 2005, the duty payable would be increased.

Customs then began liquidating and/or reliquidating all of ICP's pending entries. Entry No. 180-05900297, which was made on April 29, 2005, and subject to the May 24, 2007 Notice of Action, was liquidated on June 29, 2007. ICP protested the liquidation of only this entry in its protest filed on July 26, 2007. ICP

---

[6] As a result, until the revocation of NYRL D86228 on January 2, 2006, importers could argue that it governed classification of the described goods.

then commenced this action, *International Custom Products, Inc. v. United States*, Court No. 07-00318 (*ICP IV*), under 28 U.S.C. § 1581(a) challenging the liquidation of only Entry No. 180-05900297. *ICP IV* alleged five causes of action similar to those raised in *ICP I*. In Count I, ICP asserted that Customs violated 19 U.S.C. § 1625(c)(1) by not publishing the Notice of Action for public notice and comment; Count II claimed the same conduct violated section 1625(c)(2) because it improperly modified a prior practice; Count III alleged that Customs needed a compelling reason to revoke a ruling; Count IV alleged that Customs' conduct violated the Administrative Procedure Act; and, Count V argued that ICP's constitutional rights were violated.

We moved to dismiss the complaint in *ICP IV* for failure to state a cause of action upon which relief can be granted, USCIT R. 12(b)(5). As set forth in our motion to dismiss the complaint, and as we continually notified ICP throughout virtually every step of the litigation in *ICP I* and this case, we explained that ICP had pled the incorrect cause of action in Counts I and II. A117-119, 140; 292, 299-300; 375; 389-391; 853; 861-863; 1515; 1525-1527. We thoroughly detailed that section 1625(c) only covered interpretive decisions, such as rulings and similar policy directives. Instead, governing statutes and long settled law provide that importers wishing to claim that Customs improperly issued a Notice of Action,

8

and/or subsequently liquidated its entry contrary to a ruling, may challenge the liquidation by protesting it, obtaining jurisdiction under 28 U.S.C. § 1581(a), and pleading the cause of action that the classification and rate of duty set forth in the liquidation is incorrect because Customs failed to follow a binding ruling, in violation of 19 C.F.R. § 177.9.

We continually notified ICP that its decision to forgo pleading the correct cause of action was fatally flawed, and had material consequences. A117-119, 140; 292, 299-300; 375; 389-391; 853; 861-863; 1515; 1525-1527. We explained that, because ICP's section 1625(c) cause of action conflicted with all statutory and regulatory authority, improperly subjected countless confidential and entry specific documents to notice and comment that were never intended to fall within its scope, and indeed greatly harmed importers because it permitted the inadvertent revocation of rulings, ICP's pleading defect was significant. While a clear avenue existed for ICP to seek relief – pleading a violation of 19 C.F.R. § 177.9, its section 1625(c) cause of action was materially flawed and would prevent recovery for ICP. **ICP consistently responded that it intentionally did not wish to allege a violation of section 177.9; but, instead desired only to proceed on its cause of action that Customs violated 19 U.S.C. § 1625(c) by issuing a Notice of Action.**

Our motion to dismiss was granted in part, and Counts III and IV were dismissed. *International Custom Products,* 549 F. Supp.2d at 1384. The trial court denied our motion regarding the remaining counts, in part on the theory that Customs' Notice of Action revoked NYRL D86228 in violation of 19 U.S.C. § 1625(c).

The parties later submitted cross motions for summary judgment on these three remaining causes of action, which the court denied. The trial court reasoned, in part, that ICP must prove that the goods in Entry No. 180-0590029-7 conformed to NYRL D86228 in order to prevail on its violation of 19 U.S.C. § 1625(c) theory pled in Counts I, II, and V. The trial court also found that the issue of whether D86228 was void *ab initio*, due to material misstatements and omissions in obtaining the ruling, required trial. In order to streamline the trial, a bifurcation order was issued that postponed trial on Counts II and V, but required trial on Court I.

### Decision of the Court Below

After a trial was held, the trial court issued a partial final judgment in *International Custom Products*, 878 F.Supp.2d at 1329. In this decision, the trial court found for ICP on the disputed factual issues. As to the legal issues, the trial court decided Count I in ICP's favor, reiterating its prior finding that the Notice of

Action was the type of interpretive decision that could and did revoke NYRL

D86228.  878 F.Supp.2d at 1349.  The trial court then went beyond any cause of

action ever pled or argued by ICP, and *sua sponte*, held that in addition to revoking

NYRL D86228, the Notice of Action violated 19 U.S.C. § 1625(c)(1) "by

liquidating" Entry No. 180-0590029-7 as dairy spread instead of as a sauce

preparation as specified in NYRL D86228.  *Id*.  The trial court therefore ordered

reliquidation of Entry No. 180-0590029-7 as a sauce preparation.[7]  Because it

found for ICP on Count I, the trial court held it did not need to reach Counts II and

V.

## SUMMARY OF THE ARGUMENT

The trial court erred in finding that ICP pled a proper cause of action in its

complaint.  The legislative and regulatory scheme is clear that if an importer

wishes to challenge the classification or assessed rate of duty of its goods, it must

wait until its entry is liquidated, protest the liquidation, commence an action

challenging the liquidation under 28 U.S.C. § 1581(a).  If an importer wishes to

challenge the assessment of duties on the theory that a binding ruling governs

classification of its goods, the proper cause of action to plead is that Customs

---

[7]  In its decision, the trial court made numerous factual and legal errors.  However,
we are only appealing the most significant legal error, its decision that a Notice of
Action could trigger 19 U.S.C. § 1625(c), as this error has irreparable and far
ranging results.

violated 19 C.F.R. § 177.9.  ICP did not do so.  It instead plead the fatally flawed

cause of action that a courtesy notice of a rate advance at the upcoming liquidation

of a specific entry was a type of interpretive decision falling within 19 U.S.C. §

1625(c), requiring public notice and comment.  However, a Notice of Action by

regulation is simply a notice issued by a specific port addressing only the

classification or rate of duty of a specific entry.  It is not the type of policy

directive covered by section 1625(c).  Moreover, expanding section 1625(c) to

cover Notices of Action, and hence, liquidations, is extraordinarily improper.  All

types of decisions, regardless if they are interpretive, or if the public could actually

comment on them, would now be subject to notice and comment.  It would equally

harm importers, because a port could inadvertently revoke a ruling issued by

OR&R and long relied upon by the importing public.  Also, finding that a Notice

of Action could trigger 19 U.S.C. § 1625(c), would mean that even though a

Notice of Action is simply an advance warning of a future rate increase on a

specific entry, is eventually superseded by the final liquidation, and is not even

independently challengeable under 19 U.S.C. § 1514(a), that Notice of Action is

nevertheless the type of interpretive policy directive which must be broadly

communicated to the public pursuant to 19 U.S.C. § 1625(c).  Despite our repeated

12

notification to ICP here that its section 1625(c) cause of action was fatally flawed, it refused to amend its pleading or proceed on the proper cause of action.

## ARGUMENT

## I.

## STANDARD OF REVIEW ON APPEAL

Determining whether a Notice of Action constitutes a decision under a statute is a question of statutory interpretation and, thus a question of law reviewed *de novo* by this Court. *Bauerhin Technologies Limited Partnership v. United States*, 110 F.3d 774, 776 (Fed. Cir. 1997); *Medline Industries v. United State*s, 62 F.3d 1407, 1408 (Fed. Cir. 1995).

## II.

## NO GROUNDS EXIST TO EXPAND 19 U.S.C. § 1625(c) TO COVER NOTICES OF ACTION

ICP alleged in its first count that Customs violated 19 U.S.C. § 1625(c)(1) because it did not publish the April 18, 2005 Notice of Action for public notice and comment. Complaint at ¶¶ 31, 32, A93. ICP proffered that this Notice of Action was a "decision" that "effectively revoked" NYRL D86228. *Id.* ICP concluded that because the April 18, 2005 "decision" was not issued pursuant to 19 U.S.C. § 1625(c), the "Notice of Action" is "null and void" and ICP is entitled to relief. Complaint at ¶ 33, A94.

13

In ruling on this Count, the lower court found that the Notice of Action was "tantamount to an interpretive ruling" which had the effect of revoking NYRL D86228 without the notice and comment procedures specified in 19 U.S.C. § 1625(c)(1) "by liquidating" Entry No. 180-0590029-7 contrary to NYRL D86228. A48.

Virtually every aspect of the trial court's decision is erroneous, and ICP itself likely agrees in part, as it did not even proffer some of the inaccurate conclusions reached by the trial court. A Notice of Action cannot revoke or "effectively" revoke a ruling; nor is it the type of decision that can trigger 19 U.S.C. § 1625(c)(1). Moreover, a Notice of Action certainly does not liquidate an entry, as found by the trial court.

## A.    The Liquidation Process

The genesis of ICP's and the trial court's errors appear to arise from their misunderstanding of the liquidation process. The process is straightforward. An importer enters its goods accompanied by its entry papers. In the papers, the importer sets forth its claimed classification, rate of duty, and appraisement, as well as including a deposit of all duties it calculates are due. 19 U.S.C. § 1484; 19 U.S.C. § 1505(a). For entries not liquidated through bypass liquidations (a process not involved here), the port of entry examines the information provided by the

14

importer, in light of other relevant precedential documents to see if they should have an effect on the liquidation.[8]  If the port does not agree with the importer's claimed classification or appraisement, the port has several options, including issuing, for example, a request for further information, or a notice of exclusion to the importer (which excludes that individual entry), or, as was done here, a Notice of Action.  A Notice of Action is a creature of a regulation, 19 C.F.R. § 152.2, which provides that:

> **If the port director believes** that the entered rate or value of any merchandise is too low, or if he finds that the quantity imported exceeds the entered quantity, and the estimated aggregate of the increase in duties on that entry exceeds $15, **he shall promptly notify the importer on Customs Form 29, specifying the nature of the difference on the notice.  Liquidation shall be made promptly** and shall not be withheld for a period of more than 20 days from the date of mailing of such notice unless in the judgment of the port director there are compelling reasons that would warrant such action.

(Emphasis added).

---

[8] An example of a precedential document is a ruling or ruling letter.  19  C.F.R. § 177.1(d)(1) defines a "ruling" as a "written statement issued by the  Headquarters office or the appropriate office of Customs . . . that interprets and  applies the provisions of the Customs and related laws to a specific set of facts."  19 C.F.R. § 177.8 explains that rulings related to a specific transaction are "ruling letters."  As noted previously, binding rulings can be issued to an importer pursuant to 19 C.F.R. § 177.9.  Each of these documents is published in the Customs Bulletin.  19 C.F.R. § 177.10(a).  In order to revoke a ruling, Customs engages in public notice and comment, and publication, pursuant to 19 U.S.C. § 1625(c) and 19 C.F.R. § 177.12.

By regulation, a Notice of Action is a courtesy notice issued by the port to an importer explaining that upon the upcoming liquidation of that individual entry, its duty rate will be increased.

The port may alternatively determine that it needs further direction from Customs' headquarters on the matter.  The port can request an "Internal advice memorandum" from Customs' Headquarters pursuant to 19 C.F.R. § 177.11, which is "[a]dvice or guidance as to the interpretation or proper application of the Customs and related laws" concerning a specific Customs transaction.  These documents are also published in the Customs Bulletin, or otherwise made available to the public.  19 C.F.R. § 177.10(a).

The port eventually liquidates the entry based on its review of the entry papers, other information if necessary, and relevant Headquarters documents.  As noted previously, liquidation is Customs' formal and final classification and assessment of duties on the entry.  19 C.F.R. § 159.1; 19 C.F.R. § 159.2.  The importer may also protest it and include an application for further review along with its protest.  A "protest review decision" is a written decision issued after an

application by the importer for further review of a protest is granted, and provides Headquarters' interpretation of the issues. *See* 19 C.F.R. § 174.23 *et seq.*[9]

While liquidation generally follows issuance of a Notice of Action, it is completely independent from a Notice of Action. The liquidation affects only the entry being liquidated. If an importer disagrees with any aspect of the liquidation, the importer must protest it. 19 C.F.R. § 174.12; 19 U.S.C. § 1514(a). Customs reviews the protest, and may grant or deny it. If Customs denies the protest, the importer may commence an action with the United States Court of International Trade under 28 U.S.C. § 1581(a) challenging the denied protest of the liquidation.

As is clear from the liquidation process, while most aspects of the liquidation of an entry are day-to-day decisions involving only that individual entry, certain interpretive documents can come into play which provide Customs' policies, interpretations, or analysis of a particular issue, and are subject to 19 U.S.C. § 1625(c). These include rulings, ruling letters, internal advice memoranda, and protest review decisions, but not Notices of Action.

---

[9] Here, had ICP filed a request for further review with its protest, it could have obtained notice and comment regarding its position, as protest review decisions (Headquarters decisions in response to a request for further review) are subject to 19 U.S.C. § 1625(c). However, ICP inexplicably chose to overlook this option.

17

**B.**     **Congress Intended That Rulings And Other Policy Directives Be Subject To Notice And Comment Under 19 U.S.C. § 1625(c).**

The trial court's major mistake was concluding that a Notice of Action was the type of formalized interpretive decision covered by 19 U.S.C. § 1625(c)(1) that could revoke a ruling, and so required notice and comment.  Instead, the plain language of 19 U.S.C. § 1625 demonstrates that 19 U.S.C. § 1625(c)(1) is only triggered by certain interpretive decisions, including rulings, ruling letters, internal advice memoranda, or protest review decisions that revoke a ruling, not simply any "decision" by a single Customs port, such as a Notice of Action.

As noted previously, 19 U.S.C. § 1625(c)(1) mandates that an "interpretive ruling or decision" which revokes a ruling must be published for notice and comment.  The question then is whether a Notice of Action is a revoking "interpretive ruling or decision" as envisioned by 19 U.S.C. § 1625(c).  Both the language of 19 U.S.C. § 1625(c) and all tools of statutory interpretation answer that question in the negative.

First, *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837 (1984) provides that if a statute is clear on its face, this Court must follow congressional intent.  *Chevron*, 467 U.S at 837.  If the statute is silent, then grammatical structure, legislative history, and substantive canons of statutory interpretation are examined to determine whether Congress has spoken on the

18

question. The expressed will or intent of Congress on a specific issue is dispositive. *DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

The plain language of 19 U.S.C. § 1625 viewed as a whole demonstrates that 19 U.S.C. § 1625(c) reflects the liquidation process as detailed above, and is only triggered by certain interpretive decisions, including rulings, ruling letters, internal advice memoranda, or protest review decisions which revoke a ruling, not simply any "decision" by a single Customs port such as a Notice of Action.

In particular, the initial section of 19 U.S.C. § 1625, 19 U.S.C. § 1625(a), details the manner in which certain interpretive documents must be issued. It requires that an "interpretive ruling (including any ruling letter, or internal advice memorandum) or protest review decision" be subject to notice and comment, and published in the Customs Bulletin.

19 U.S.C. § 1625(c) follows 19 U.S.C. § 1625(a), and explains the parallel process that must be undertaken by Customs to revoke or modify the interpretive documents issued under section (a). Section (c) copies the language of section (a) almost exactly, and directs that a "proposed interpretive ruling and decision" which revokes or modifies a ruling or practice must be published. Because subsection (a) must be read in *pari materia* with subsection 1625(c), the term "interpretive ruling

19

and decision" in subsection 1625(c) is limited, as explicitly stated in subsection 1625(a), to an "interpretive ruling (including any ruling letter, or internal advice memorandum) or protest review decision" which revokes a ruling.

This Court examined this issue in *California Industrial Products, Inc. v. United States*, 436 F.3d 1341, 1354 (Fed. Cir. 2006), and held that 19 U.S.C. § 1625(c)(1) only applies when Customs issues an "interpretive ruling or decision." Because 19 U.S.C. § 1625(c) is part of 19 U.S.C. § 1625, the Court examined the language of 19 U.S.C. § 1625(a), and found that "interpretive ruling" is expressly defined as "including any ruling letter, or internal advice memorandum." *Id*. at 17-18. The Court then noted in regard to 19 U.S.C. § 1625(c) that:

> At the same time, two lines later, the text refers back to the previously noted "interpretive ruling . . . or protest review decision" as "such ruling or decision." "[I]nterpretative ruling . . . or protest review decision" and the later shorthand reference to that phrase ("such ruling or decision") should be construed consistently in section 1625.

*Id*.

The Court then cited to *Timex V.I., Inc. v. United States*, 157 F.3d 879, 884 (Fed. Cir. 1998), which held that it "is well-settled that words appearing in a statute should be read consistently: a particular word appearing multiple times in a statutory provision should be given the same reading, unless there is a clear

20

Congressional intent to the contrary." *Id*. The Court then concluded that,

"'decision' in the phrase 'ruling or decision' in 19 U.S.C. § 1625(c), includes a

'protest review decision.'" *Id*. at 18.

*California Industrial*, 436 F.3d at 1341, consequently confirms that 19

U.S.C. § 1625(c) must be read *in pari materia* with subsection (a), and that it

covers formalized interpretive decisions such as rulings, internal advice

memoranda, or protest review decisions.

Assuming for the sake of argument that 19 U.S.C. § 1625(c) was not read in

*pari materia* with 19 U.S.C. § 1625(a), judicial precedent also establishes that

grammatically, the phrase "proposed interpretive ruling or decision" in 19 U.S.C.

§ 1625(c) must be read as applying subsection (c) to "proposed interpretive rulings

and proposed interpretive decisions (such as rulings, ruling letters, internal advice

memoranda, and protest review decisions). In other words, the term "interpretive"

modifies both "rulings" and "decisions," so that only proposed interpretive rulings

and proposed interpretive decisions can modify or revoke a ruling. It would be

error to conclude that in 19 U.S.C. § 1625(c), the term "interpretive" modified only

the term "ruling" and not "decision" so that any "decision" by Customs can trigger

19 U.S.C. § 1625(c).

Various courts which interpreted similar phrases, *i.e.*, where an adjective is followed by two or more nouns separated by a disjunctive "or," found that the adjective modifies all of the nouns following it.  In *Houbigant, Inc. v. Federal Ins. Company*, 374 F.3d 192, 203-204 (3rd Cir., 2004), the court found that in a phrase "copyrighted titles, slogans or other advertising  materials," under the basic rules of grammar and the plain meaning of the statute, "copyrighted" modifies "titles," "slogan," and "other advertising material."  In *Employers Reinsurance Corp. v. Teague*, No. 91-2299, 1992 WL 200868 (4th Cir. 1992), the court stated that "in accordance with grammatical rules and popular usage, the adjective 'negligent' modifies every word" in the phrase "negligent error, omission, misstatement or misleading statement."  The court in *Watkins v. United States*, No. 02 C 8188, 2003 WL 1906176 (N.D. Ill. April 17, 2003), said that in a phrase "loss, miscarriage, or negligent transmission," "[h]ad the drafters intended to completely exclude intentional torts, they would have placed the word `negligent' at the beginning of the section or before each event so that it could be read as applying equally to loss, miscarriage and transmission."  2003 WL 1906176.  Furthermore, in *Consumers Union of United States, Inc. v. Veterans Administration*, 301 F. Supp. 796 (S.D.N.Y. 1969), the court interpreted a statutory exemption, which stated: "This section does not apply to matters that are … (2) related solely to the

22

internal personnel rules and practices of an agency."  The court determined that the adjectives "internal" and "personnel" modified the noun "practices" because, "[f]rom a grammatical point of view, it is probable that the Congress intended both nouns to be modified by the adjectives for otherwise 'the' would have been inserted before 'practices.'"  *Id.*  The court noted, however, that "an article [was] a slim thread upon which to hang an interpretation," and looked "to the legislative history for clarification."  *Id.*  Having examined the legislative history, the court concluded that the words "internal" and "personnel" modified both nouns "rules" and "practices."  *Id.* at 801.

Here, the legislative history of 19 U.S.C. § 1625(c) establishes that it was designed to cover only interpretive documents such as rulings, ruling letters, internal advice memoranda, and protest review decisions.  The legislative history of 19 U.S.C. § 1625(c) provides that:

> Section 623 of H.R. 3450 amends 19 U.S.C. § 1625 by requiring that interpretative rulings, ruling letters or internal advice memorandum be published within 90 days in the Customs Bulletin or otherwise be made available for public inspection.  Section 623 further provides that adverse interpretative rulings may be appealed within Customs, and requires that a ruling modifying or revoking an existing ruling be first published in the Customs Bulletin for notice and comment . . .
>
>                                    . . .

<u>Reasons for change</u>

Section 623 **will provide assurances of
transparency concerning Customs rulings and policy
directives through publication in the Customs
Bulletin or other easily accessible source.** It is the
Committee's intent that the Customs Service shall be
deemed to have satisfied any publication requirements
mandated by this section if it disseminates such
information by the U.S. Customs Service electronic
bulletin board and such information remains publicly
available in an accessible, retrievable format.

H. Rep. No. 103-361-I regarding § 623 of the North American Free Trade

Agreement Implementation Act, P.L. 103-182, reprinted in 1993 USCCAN 2552,

2674 (emphasis added).

The Senate Report provides that:

Currently under section 625 of the Tariff Act of
1930, within 120 days after issuing any **precedential**
decision (including any ruling letter or internal advice
memorandum, or protest review decision), the Secretary
of the Treasury is required to publish the decision in the
"Customs Bulletin" or otherwise make it available for
public inspection.

Section 623 of this bill reduces the time period for
publication to 90 days. It further provides that adverse
interpretative rulings may be appealed within the
Customs Service, and requires that a ruling modifying or
revoking an existing ruling be first published in the
"Customs Bulletin" for notice and comment.

103 S. Rpt. No. 189 (emphasis added).

The legislative history to 19 U.S.C. § 1625(c) therefore demonstrates that 19 U.S.C. § 1625(c) was drafted to "provide assurances of transparency concerning Customs rulings and policy directives."  H. Rep. 103-361, 103rd Cong., 1st Sess. 124 (emphasis added).  Congress designed 19 U.S.C. § 1625 to ensure that the importing public had knowledge of Customs' basic positions, and the reasons underlying those policies.  By using the phrase "Customs rulings and policy directives," in the legislative history, Congress illustrated the type of interpretive, instructive, and far reaching directives 19 U.S.C. § 1625(c) was intended to cover. Congress also demonstrated that day-to-day decisions by Customs regarding the actual classification, appraisement, or liquidation of individual entries were not intended to fall within 19 U.S.C. §  1625(c); these limited decisions contained no policy interpretations or positions which affect the general importing public. Because it was unnecessary to require transparency for the public as a whole, it was equally unnecessary to mandate the time-consuming and expensive process of notice and comment, and publication.  Notice to the actual importer was sufficient.

With this goal in mind, to ensure that the public had access to Customs' basic policies and interpretations, (or, as stated in the legislative history, "Customs rulings and policy directives"), Congress drafted 19 U.S.C. § 1625, and denominated these Customs rulings and policy directives as an "interpretive ruling

25

(including any ruling letter, or internal advice memorandum) or protest review decision" in the text of 19 U.S.C. § 1625(a), and through shorthand, an "interpretive ruling or decision" in the text of 19 U.S.C. § 1625(c).  Even though Congress used the words "interpretive ruling or decision" in 19 U.S.C. § 1625(c), it is clear from the legislative history that Congress intended this phrase to be synonymous with "Customs rulings and policy directives."  As the regulations establish, these interpretive documents are generally rulings, ruling letters, internal advice memoranda, and protest review decisions.

A Notice of Action is clearly not an interpretive ruling, ruling letter, internal advice memorandum, or protest review decision; it is not a Customs ruling or policy directive, or similar to those types of documents.  A Notice of Action is singularly a creature of regulation.  Its powers are limited by the plain terms of the regulation under which it is issued, to provide notice to an importer of a future rate advance which the port director believes is appropriate in the forthcoming liquidation of a specific entry.  *See* 19 C.F.R. § 152.2.  The regulation does **not** provide that it is subject to notice and comment.  Nothing within 19 C.F.R. 152.2 empowers such a courtesy notice beyond the limits of that regulation, into a document which could modify or revoke a ruling.  The Notice of Action at best,

26

therefore, reflects the port director's belief regarding the rate of duty regarding a specific entry.

A Notice of Action is not issued by Customs Headquarters, as required by the regulations for most rulings, rulings letters, internal advice memoranda, and protest review decisions; it is not a written analysis issued by Customs applying facts and law as these documents are. It provides no guidance or positions which would benefit the general importing public. Requiring public notice and comment, and publication would be an enormously time consuming and expensive process, and serve no purpose whatsoever. Certainly, the public could not comment on the port's views of the specific rate of duty for an importer's individual entries, the very heart of the Notice of Action, because virtually all of the details underlying the proposed rate of duty must be withheld as confidential. *See Trans-Pacific Policing Agreement v. U.S. Customs Service*, 177 F.3d 1022 (D.C. Cir. 1999). In particular, classification and valuation of goods are based on an importer's confidential information (including type of goods imported, value of the goods, amount of the goods imported).

Furthermore, an incalculable number of other "decisions" would have to undergo notice and comment, and publication, under 19 U.S.C. § 1625(c) every year. Each of the numerous times a month any port or office within Customs

27

makes an internal "decision" that a prior ruling is unrelated to an individual entry, for whatever reason, and that an entry need not be valued, classified, liquidated, or treated precisely the same as another, Customs would have to publish that "decision" for notice and comment, or risk violating 19 U.S.C. § 1625(c). Every time a port director liquidated an entry seemingly adverse to a ruling, even for valid reasons such as that the ruling did not actually address the imported merchandise at hand, they could be viewed as making a "decision," which would, according to the trial court's decision, have to be published. If Customs did not publish it, Customs would be risking the result which occurred in this case.

The effect would be that the public would be invited, again, to comment on how specific entries of goods should be classified or whether Customs could rate advance individual entries. In addition to being utterly onerous and never envisioned by Congress, such a result is unreasonable because public comment would be, again, invited on transactions whose essential details are confidential and could not even be released to the public. Moreover, decision, a port director could unintentionally revoke a ruling issued by Customs headquarters without Customs headquarters knowledge or consent, simply by an inadvertent choice of language in a Notice of Action or liquidation.

Indeed, other settled authority demonstrates that Congress did not envision that a Notice of Action would fall within the scope of section 1625(c).  Instead, Congress viewed any rate of duty "decision" contained in a Notice of Action to be preliminary, and only finalized at, and subsumed into, liquidation.  And, correspondingly, a challenge to rate of duty was to be asserted only through a protest to the final rate of duty determination evidenced in the liquidation.  19 C.F.R. § 159.1 and 19 C.F.R. § 159.2 explain that liquidation is the final classification and assessment of duties.  In turn, 19 U.S.C. § 1514(a), which governs liquidations and protests, states that:

> . . . . decisions of [Customs], including the legality of all orders and findings entering in to the same, as to –  . . . (2) the classification and rate and amount of duties chargeable; . . . (5) the liquidation or reliquidation of an entry. . . shall be final and conclusive upon all persons . . . unless a protest is filed in accordance with this section, or unless a civil action contesting the denial of a protest, in whole or in part, is commenced in the United States Court of International Trade . . . .

This provision clearly shows that Congress intended a liquidation in most cases to be the final challengeable event by Customs, that all decisions inherent in liquidation be subsumed in the liquidation, and one unified procedure for challenging all aspects of a liquidation  – including the legality of any orders or findings involved in the administrative process relating to valuation or

29

classification – exist, with the concomitant time limitations and review that limited the waiver of sovereign immunity.

Judicial precedent explains that at the moment of liquidation, "all decisions of the collector involved in the ascertaining and fixing the rate and amount of duties chargeable against imported merchandise entered for consumption are merged in and become a part of a legal liquidation, and it is a legal liquidation only . . . against which a protest will lie." *Dow Chem. Co. v. United States*, 10 CIT 550, 557, 647 F. Supp. 1574, 1581 (1986) (quoting *Dart Export Corp. v. United States*, 43 CCPA 64, 73 (CCPA 1956)); *see also United States v. Utex Int'l, Inc.*, 857 F.2d 1408, 1410 (Fed. Cir. 1988) ("All findings involved in a district director's decision merge in the liquidation.  It is the liquidation which is final and subject to protest, not the preliminary findings or decisions of customs officers.") (citation omitted).

Under this scheme, if an importer wishes to challenge rate of duty such as ICP intended here, it must protest the rate of duty decision reflected in the liquidation.  It cannot attack the Notice of Action because the Notice of Action only warns of a potential future increase in duty rate, which actually occurs at liquidation.  Since a Notice of Action is, by statute, not even ever subject to individual review (because it is a preliminary decision), the trial court's finding is

absurd that it was nevertheless the type of interpretive ruling or decision that could

subject to notice and comment under section 1625(c).

Finding that a Notice of Action could trigger 19 U.S.C. § 1625(c), would

mean that even though a Notice of Action is simply an advance warning of a future

rate increase on a specific entry, is eventually superseded by the final liquidation,

and is not even independently challengeable under 19 U.S.C. § 1514(a), that

Notice of Action is nevertheless the type of interpretive policy directive which

must be broadly communicated to the public pursuant to 19 U.S.C. § 1625(c).  No

support exists for such an absurd result.

Finally, nothing within a Notice of Action or any statute or regulation

suggests a Notice of Action could ever have the authority to modify or revoke a

prior interpretive ruling or decision.  19 C.F.R. § 177.12 governs ruling revocation

and modification, and provides that an interpretive ruling, which includes an

internal advice decision, or a holding or principle covered by a protest review

decision, may be modified or revoked by an interpretive ruling.  It does not provide

that an entry specific document such as a Notice of Action could revoke a ruling.

By analogy, just as a district court cannot overrule a Court of Appeals' decision, an

action by an individual port (whether a Notice of Action, liquidation, or protest

denial) cannot revoke an interpretive ruling or decision by Customs Headquarters.

Similarly, 19 C.F.R. § 152.2 establishes that Notices of Action serve only as notice of a rate increase in a future liquidation of a specific entry, and are mailed only to the importer. The regulation does not permit them to modify or revoke rulings.

## C. The Undisputed Evidence Establishes That The Notice Of Action Was Not A *De Facto* Or Effective Revocation Of NYRL D86228

Next, not only is all authority clear that a Notice of Action cannot legally revoke a ruling, but the actual evidence in this case is uncontestable that the April 18, 2005 Notice of Action was not intended to function, or did it ever operate, as a *de facto* or "effective" revocation of NYRL D86228. The evidence shows that after the port forwarded its classification concerns to the NIS, the NIS properly pursued the issue up the chain of command, by contacting Customs' Headquarters, OR&R – the office of Customs responsible for issuing and revoking most rulings. OR&R responded that revocation was not proper because NYRL D86228 was valid and accurate for the merchandise it described, and OR&R does not revoke correct rulings.[10] A112. Here, ICP's imported goods materially differed from that described in NYRL D86228, and so NYRL D86228, while valid, was simply inapplicable to ICP's actual entries. *Id*. Because of OR&R's opinion that NYRL

---

[10] It is important to note equally that no authority anywhere suggests that a decision by OR&R that a ruling is valid, and just not applicable to specific entries, is subject to 19 U.S.C. § 1625(c). Again, if an importer wishes to challenge such a decision that a ruling is inapplicable (and resulting liquidation), its proper cause of action is 19 C.F.R. § 177.9.

D86228, while valid, was inapplicable to ICP's dairy spread, the port then prepared

to liquidate the entries.  The port noted that several entries remained unliquidated,

and the port anticipated issuing a Notice of Action shortly rate advancing ICP's

dairy spread to the correct classification.  A269-272.  However, because of the

large amount of money involved, various personnel within the port determined that

headquarters for the port, OFO, should be alerted about the forthcoming Notice of

Action.  A269-273.  Interestingly, the communications within the port all

definitively reflect the port's and the NIS's understanding that the idea of

revocation of NYRL D86228 had been discussed and raised within OR&R, and

OR&R determined that revocation was inappropriate because NYRL D86228 was

valid and correct for the set of circumstances described.  Since ICP's dairy spread

materially differed from that in NYRL D86228, the ruling was valid, but

inapplicable in the instant circumstances.  *Id*.  The port's headquarters, OFO,

eventually gave the port a "green light" to proceed with the rate advances for ICP.

A273.

The evidence shows therefore that the Notice of Action functioned as it was

supposed to by regulation, a courtesy notice sent by the port director pursuant to 19

C.F.R. § 152.2 to warn the importer of a forthcoming duty rate advance; it was

plainly not a ruling (or any other type of similar policy directive), nor ever

33

intended to function (or actually operate) as a "*de facto*" or "effective" revocation of NYRL D86228.

Similarly, no evidence exists suggesting that the port or Customs Headquarters tried to circumvent the notice and comment provisions of 19 U.S.C. § 1625(c) by issuing the Notice of Action.  The evidence is undisputable that OR&R determined that NYRL D86228 was valid and should be remain in force, and it so directly instructed the port.  The only decision made by OR&R adverse to ICP was that the ruling covered different goods than those ICP was importing. These day-to-day decisions are necessary, and frequently made within Customs; they enable Customs and importers to ascertain whether rulings cover specific importations.  In no way do they suggest that instead of being the crucial, useful, and required determinations that they are; they are really nefarious schemes to avoid section 1625(c).

Indeed, to the opposite, the evidence clearly establishes that Customs quickly, freely, and publically turned to 19 U.S.C. § 1625(c) as soon as it determined that NYRL D86228 should be revoked.  After ascertaining that NYRL D86228 was actually substantively incorrect, Customs published a revocation (HQ 967780) of NYRL D86228 on November 2, 2005, with an effective date, in compliance with 19 U.S.C. § 1625(c)(1), of January 2, 2006.

In short, the legislative scheme is crystal clear, and Customs complied with both the letter and spirit of all authority.  Customs' Headquarters properly considered whether NYRL D86228 was incorrect, and decided that it was a valid ruling.  It notified the NIS and port that the ruling remained effective; it simply did not involve the merchandise ICP was attempting to import.  No authority provides that such frequent and day- to-day decision making specific to any entry, can revoke a ruling, or is or should be, subject to notice and comment.  Next, the port properly notified ICP that its entry would be rate advanced at the upcoming liquidation through the proper regulatory vehicle of a Notice of Action.  The port then liquidated ICP's entry, and ICP protested the liquidation.  ICP's inexplicable decision to then ignore the provisions of 19 U.S.C. § 1625(c) and 19 C.F.R. § 152.2, does not provide any basis for finding that Customs violated any statutory or regulatory provision.

## D.    Expanding 19 U.S.C. § 1625(c) To Cover Non-Interpretive Decisions Is Particularly Unwarranted Since ICP Knew Of The Correct Cause Of Action And Yet Refused To Pursue It

Finally, as noted above, ICP's problems are solely of its own making. ICP, as with all importers, have clear recourse to assert that Customs improperly ignored a ruling, issued a Notice of Action, and subsequently liquidated its entry contrary to a ruling.  The importer is supposed protest its liquidation, obtain

jurisdiction under 28 U.S.C. § 1581(a), and plead the cause of action that the

classification and rate of duty set forth in the liquidation is incorrect because

Customs failed to follow a binding ruling, in violation of 19 C.F.R. § 177.9.

As discussed previously, this process is so settled and clear that we

repeatedly notified ICP and the trial court throughout *ICP I* and virtually every step

of the litigation in this case that this was the correct procedure and the cause of

action which ICP should have pled, that ICP failed to allege it, its decision to

proceed instead under 19 U.S.C. § 1625(c) was fatally flawed, and had material

consequences.  A117-119, 140; 292, 299-300; 375; 389-391; 853; 861-863; 1515;

1525-1527.

We also repeatedly explained that no authority supported ICP's section

1625(c) theory, it completely contradicted the undisputed evidence in this case, and

it would wreak havoc within Customs as it would improperly subjected numerous

documents to notice and comment that were never intended to fall within its scope.

ICP consistently responded that it intentionally did not wish to allege a violation of

section 177.9; but, instead desired only to proceed on its theory that Customs

violated 19 U.S.C. § 1625(c) by issuing a Notice of Action.

ICP's repeated decisions to ignore the undisputed evidence in this case, its

clear legal recourse, even though it was on clear notice of its existence, and,

instead pursue its flawed 19 U.S.C. § 1625(c) claims should not be countenanced.

Most obviously, ICP cannot point to any reason why it should be entitled to such

extraordinary relief.  Excusing its behavior only permits 19 C.F.R. § 177.9, 19

U.S.C. § 1514, and 28 U.S.C. § 1581(a) to be freely ignored, at great expense to

Customs and the importing public.

In the face of the extraordinary effect of the lower court's decision on

Customs' practice, no justification exists to force the "round peg" of a Notice of

Action into the "square hole" of 19 U.S.C. § 1625(c).  As this Court found in

*American Air Parcel Forwarding Company, Ltd. v. United States*, 2 Fed. Cir. 1, 6,

718 F.2d 1546 (1983), with regard to 28 U.S.C. § 1581(a), "That importers here

could fashion a more desirable remedy does not make the remedy fashioned by

Congress constitutionally inadequate."

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment of the United States Court of

International Trade should be reversed and this action remanded to the Court of

International Trade with instructions to dismiss.

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Barbara S. Williams
BARBARA S. WILLIAMS
Attorney in Charge
International Trade Field Office

/s/ Edward F. Kenny
/s/ Jason M. Kenner
EDWARD F. KENNY
JASON M. KENNER
Trial Attorneys

Of Counsel:                                 Civil Division, Dept. of Justice
Yelena Slepak                           Commercial Litigation Branch
Office of Assistant Chief Counsel       26 Federal Plaza - Room 346
International Trade Litigation           New York, New York  10278
U.S. Customs and Border                 Attorneys for Defendant
    Protection                    Tel. No. (212) 264-9230 or 9280

ADDENDUM

Slip Op. 12-140

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| INTERNATIONAL CUSTOM PRODUCTS, INC., <br><br>         Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br>         Defendant. | Before: Gregory W. Carman, Judge <br><br> Court No. 07-00318 |

[*Following bench trial, and upon the Court's finding that Customs unlawfully rate-advanced Plaintiff's merchandise, judgment is entered in favor of Plaintiff.*]

Eckert Seamans Cherin & Mellott, LLC (Gregory H. Teufel and Jeremy L. S. Samek) for Plaintiff.

Stuart F. Delery, Assistant Attorney General; Jeanne E. Davidson, Director; Barbara S. Williams, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Edward F. Kenny and Jason M. Kenner); Yelena Slepak, Office of the Assistant Chief Counsel, Int'l Trade Litigation, U.S. Customs and Border Protection, of counsel, for Defendant.

November 20, 2012

### OPINION & ORDER

CARMAN, JUDGE: Following a bench trial held from February 6, 2012 to February 10,

2012, this matter is now before the Court for findings of facts, conclusions of law, and

entry of judgment. Upon considering and weighing the evidence on the trial record, the

Court finds that Plaintiff, International Custom Products, Inc. ("ICP"), has proven that

*International Custom Products, Inc. v. United States*          Page 2
Court No. 07-00318

the product it imported in the entry underlying this case, called "white sauce,"

conformed to a properly obtained binding ruling letter, D86228 (the "Ruling Letter"),

issued by the New York office of the Bureau of Customs and Border Protection ("CBP"

or "Customs") on January 20, 1999. Because the Ruling Letter, which had not been

properly revoked, controlled the tariff classification of ICP's white sauce, the Court

finds that CBP acted contrary to law in liquidating the entry under a different tariff

classification associated with a much higher tariff rate. As a consequence, the Court will

issue a partial final judgment pursuant to USCIT Rule 54(b),[1] requiring Customs to

reliquidate the single entry of Plaintiff's merchandise underlying this suit at the rate

established by the Ruling Letter and to refund to Plaintiff any overpayment with

interest as provided by law.

## I. PROCEDURAL BACKGROUND OF CASE

Litigation between Plaintiff and the government over the liquidation rate of

entries of Plaintiff's white sauce has been ongoing since 2005. It was on April 18, 2005

that Customs issued a Notice of Action which had as its result that 100 entries (the

---

[1] USCIT Rule 54(b) permits the Court to "direct entry of a final judgment as to
one or more, but fewer than all, claims" where the Court "expressly determines that
there is no just reason for delay." The Court will avail itself of this procedure because
certain of Plaintiff's claims have been stayed on agreement of the parties until such time
as judgment has been issued on the claims decided in this opinion and all appeals have
been exhausted. Further details are provided below.

*International Custom Products, Inc. v. United States*                    Page 3
Court No. 07-00318

"Affected Entries") of ICP's white sauce were reclassified under 0405.20.3000, HTSUS,

for "[b]utter and . . . dairy spreads," rather than as "[s]auces and preparations therefor"

under 2103.90.9091, HTSUS (the 2005 analog of 2103.90.9060, HTSUS, which was the

subheading provided for in the 1999 Ruling Letter). The Notice of Action stated that

"action has been taken" to rate-advance the Affected Entries, and that in the future, "all

shipments of this product must be classified" under 0405.20.3000, HTSUS. The

consequence of the reclassification was an increase of approximately 2400% in the duties

owed by ICP. Since 2005, ICP has sought relief in various forms from the Notice of

Action.

## A.    Overview of ICP Cases

Customs's reclassification of ICP's white sauce has spawned a number of

lawsuits. A brief overview of that litigation is appropriate here to provide the context

within which the current case arises.

### 1.    The 2005 Case

Challenges to tariff classification are typically brought before this court under

28 U.S.C. § 1581(a). However, in its 2005 suit (Court No. 05-00341), ICP asserted

jurisdiction under the Court's residual jurisdictional statute, 28 U.S.C. § 1581(i)(4). The

Court may not exercise § 1581(i) jurisdiction when the plaintiff can access the court "by

*International Custom Products, Inc. v. United States*                    Page 4
Court No. 07-00318

traditional means, such as under § 1581(a)," unless "the remedy provided under

[subsection (a)] would be manifestly inadequate." Thyssen Steel Co. v. United States, 13

CIT 323, 328, 712 F. Supp. 202, 206 (1989). This Court determined that a suit brought

pursuant to § 1581(a) would be manifestly inadequate because ICP was challenging not

the "classification of its white sauce as enunciated in the Notice of Action," but rather

"the Notice of Action itself and Customs's authority to issue it." International Customs

Products, Inc. v. United States, 29 CIT 617, 622, 374 F. Supp. 2d 1311, 1320 (2005)

("ICP I"). This Court also found that ICP's remedy under § 1581(a) would be manifestly

inadequate because the company would likely cease to exist due to the financial effects

of the Notice of Action before any § 1581(a) remedy could be obtained. Id. at 1322.

Having determined that jurisdiction under § 1581(i) was proper, this Court

proceeded to grant a motion by ICP for judgment on the agency record, declaring that

the Notice of Action was null and void because it was a "decision" that revoked the

Ruling Letter without following the notice-and-comment requirements for revocation of

ruling letters set forth in 19 U.S.C. § 1625(c). Id. at 1325-30. This Court found that

Customs must reliquidate the Affected Entries consistent with the Ruling Letter, which

this Court declared was still in force at the time the entries had been rate-advanced. Id.

at 1333.

*International Custom Products, Inc. v. United States*                    Page 5
Court No. 07-00318

The Court of Appeals for the Federal Circuit ("CAFC") reversed this Court

regarding jurisdiction, holding that "the remedy provided by subsection 1581(a) is not

manifestly inadequate, and that therefore the Court of International Trade lacked

jurisdiction under subsection 1581(i)(4)." International Custom Products, Inc. v. United

States, 467 F.3d 1324, 1327 (Fed. Cir. 2006) ("ICP II"). Due to the jurisdictional defect,

the CAFC vacated this Court's decision regarding the merits of ICP's arguments and

remanded the case for dismissal. Id. at 1328. Accordingly, this Court dismissed ICP's

2005 case. International Custom Products, Inc. v. United States, 31 CIT 266 (2007)

(Judgment Order).

    2.    The 2007 Case (the Current Case)

In 2007, ICP timely filed this lawsuit, seeking, in essence, to raise the same

challenges to the Notice of Action that were raised in Court No. 05-00341, but on

§ 1581(a) jurisdictional grounds. A plaintiff must protest before Customs the duties

imposed, have Customs deny that protest, then pay all imposed duties before bringing

suit in the Court of International Trade ("CIT") under § 1581(a). Apparently because

Plaintiff could not afford to pay the 2400% increase in duties on the scores of Affected

Entries, Plaintiff protested and paid duties on a single entry, entry 180-0590029-7 ("the

Entry"), upon which it bases this suit. The Entry was part of a group of 11 entries

brought into the United States in 2005 after the Notice of Action was issued. Customs

liquidated the Entry at the higher rate provided in the Notice of Action on June 29, 2007

and ICP protested the liquidation on July 26, 2007 with a request for expedited

treatment. The protest was deemed denied. ICP paid the assessed duties by August 27,

2007 and filed this suit on August 28, 2007.

    3.    <u>The 2008 Cases</u>

    Two other lawsuits filed by Plaintiff in 2008 are stayed pending the resolution of

the current case. The first of these suits, assigned Court No. 08-00055, challenges as

unlawful certain actions Customs took after importation of the Entry in the instant case.

The precise content of that suit is immaterial here.[2] <u>See</u> Compl., Court No. 08-00055,

ECF No. 4. The second 2008 suit, assigned Court No. 08-00189, also addresses events

postdating the Customs actions challenged in the instant case and is immaterial here.[3]

<u>See</u> Compl., Court No. 08-00189, ECF No. 2.

---

[2] Court No. 08-00055 challenges Customs's formal revocation of the Ruling Letter
pursuant to the notice-and-comment procedures of 19 U.S.C. § 1625(c), effective January
2, 2006. Those events postdate the events giving rise to the instant suit.

[3] Court No 08-00189 challenges on various grounds Customs's reclassification of
13 entries of ICP's white sauce in 2007.

*International Custom Products, Inc. v. United States*                    Page 7
Court No. 07-00318

The Court stayed all proceedings in Court No. 08-00055 and Court No. 08-00189

on October 29, 2008 and August 5, 2009, respectively.[4]

**B.   Prior Proceedings in the Current Case**

It will be useful to summarize here the prior opinions and proceedings of the

Court with regard to the current case, leading up to the trial.

On November 30, 2007, the government responded to the complaint with a

motion to dismiss for failure to state a claim upon which relief can be granted. See

Motion to Dismiss, Court No. 07-00318, ECF No. 23.  The Court granted the

government's motion to dismiss as to two of ICP's claims.[5] See International Custom

Products, Inc. v. United States, 32 CIT 302, 549 F. Supp. 2d 1384 (2008) ("ICP III").

However, the Court denied the motion to dismiss as to three of ICP's claims: (a) Count

I, alleging that the 2005 Notice of Action was unlawful because it revoked the binding

Ruling Letter without going through the notice-and-comment revocation procedures

_____

[4] In Court No. 08-00055, the parties must file a joint scheduling order thirty days
following entry of final judgment, and the conclusion of any appeals, in the current
case.  Order, Court No. 08-00055, ECF No. 12.  Court No. 08-00189 is stayed until ten
days after entry of a final judgment in the current case.  Order, Court No. 08-00189, ECF
No. 47.

[5] The dismissed claims alleged that Customs impermissibly modified the Ruling
Letter without a compelling reason, and that Customs's revocation of the Ruling Letter
constituted rulemaking conducted without notice and comment in violation of section
553 of the Administrative Procedure Act, codified at 5 U.S.C. §§ 553 et seq.

*International Custom Products, Inc. v. United States*                    Page 8
Court No. 07-00318

required by 19 U.S.C. § 1625(c)(1), and applied that revocation retroactively; (b) Count

II, making a similar allegation that Customs revoked a prior treatment of ICP's white

sauce in violation of notice-and-comment requirements provided by 19 U.S.C.

§ 1625(c)(2); and (c) Count V, alleging that Customs violated ICP's constitutional due

process rights when it revoked the Ruling Letter, depriving ICP of a property interest in

continued classification of its white sauce entries under the Ruling Letter absent notice

and an opportunity to comment pursuant to 19 U.S.C. § 1625(c). Id. In the course of

determining that Count I was not subject to dismissal for failure to state a claim upon

which relief could be granted, the Court held that the Notice of Action was an

"interpretive ruling or decision" within the meaning of 19 U.S.C. § 1625(c)(1) and "that,

if the actions alleged of Customs are proven, Customs effectively revoked ICP's

classification ruling by its conduct in connection with the white sauce importations."

ICP III, 549 F. Supp. 2d at 1393-94. After the Court issued its decision on the motion to

dismiss, the government filed an answer to the complaint on April 14, 2008. Answer,

Court No. 07-00318, ECF No. 44.

Plaintiff filed a motion for summary judgment on January 4, 2008 (Court No. 07-

00318, ECF No. 27), and the government filed a cross-motion for summary judgment on

September 26, 2008 (Court No. 07-00318, ECF No. 67). The Court denied those motions

*International Custom Products, Inc. v. United States*                    Page 9
Court No. 07-00318

on January 29, 2009, finding that genuine issues of material fact precluded resolving the

case without a trial. <u>International Custom Products, Inc. v. United States</u>, 33 CIT __,

2009 WL 205860 (2009). In its opinion on the cross-motions for summary judgment, the

Court specifically found that jurisdiction in the current case was properly based upon

§ 1581(a) and extended only to the Entry (entry 180-0590029-7), but not to any of the

other 99 Affected Entries. <u>Id.</u> at *3.

    The Court also identified in detail the issues of material fact preventing entry of

summary judgment. First, the Court found that "there is a genuine issue of material

fact as to whether the actual goods Plaintiff imported conform to the description of

'white sauce'" in the Ruling Letter. <u>Id.</u> at *5. At issue was whether the white sauce in

the Entry contained xanthan gum or carboxymethylcellulose ("CMC") at all, and

whether it contained milkfat (interchangeably referred to as "butterfat") in

concentrations conforming to the Ruling Letter. <u>Id.</u> Second, the Court found that

"[w]hether or not Plaintiff made entries of 'white sauce' that . . . can serve as 'prior

treatment' for the purposes of 19 U.S.C. § 1625(c)(2), represents a genuine issue of

material fact." <u>Id.</u> at *7. Third, the Court found that judgment could not be entered

summarily on Plaintiff's Due Process claim because that claim relied on the alleged

violation of 19 U.S.C. § 1625(c)(1) as to which the Court had already indicated genuine

*International Custom Products, Inc. v. United States*                          Page 10
Court No. 07-00318

material issues of fact existed.  Id. at *8.  The government's cross-motion sought

summary judgment on the basis that ICP had made a material misstatement or

omission, by mischaracterizing the contents of white sauce and by failing to disclose

known typical uses and designations of white sauce, when applying for the Ruling

Letter.  Id.  The Court found that, although the government had presented "pertinent"

evidence on these issues, that evidence was insufficient to determine the issue as a

matter of law.  Id.

## C.    Bifurcation of the Current Case

On August 4, 2010, the parties jointly moved to bifurcate trial of Plaintiff's

remaining claims in the current case into two phases, with Plaintiff's 19 U.S.C.

§ 1625(c)(1) claim and due process claim to be tried first and Plaintiff's 19 U.S.C.

§ 1625(c)(2) claim to be reserved and stayed for possible later trial, pending the outcome

of the first phase. (Joint Motion to Sever (Bifurcate Trial), Court No. 07-00318, ECF No.

157.) The Court granted this motion. (Order of August 13, 2010, Court No. 07-00318,

ECF No. 158.) For this reason, no evidence concerning Plaintiff's 19 U.S.C. § 1625(c)(2)

claim was taken during the present trial; that portion of Plaintiff's complaint remains

stayed at this time.

*International Custom Products, Inc. v. United States*                    Page 11
Court No. 07-00318

## II. PRETRIAL

After some additional motion practice, and a limited extension of discovery, the

parties submitted proposals for a pretrial order to govern trial of this case. In doing so,

differences between the parties as to the admissibility of certain evidence arose.

### A.    Evidentiary Issues

Two evidentiary issues raised by the parties in the pretrial stage remain pending

before the Court. First, Plaintiff sought an adverse inference that certain samples of

white sauce, destroyed while in the government's possession, contained ingredients

that conformed to the description of white sauce set forth in Plaintiff's ruling request.

(Pl.'s Mot. in Limine, Court No. 07-00318, ECF No. 172.)  The Court denied this motion,

but permitted Plaintiff to present evidence relevant to spoliation at trial and renew the

motion at the close of trial if Plaintiff wished to do so.  (Order of May 26, 2011, Court

No. 07-00318, ECF No. 190.)  Second, the Court deferred ruling on a motion by

Defendant (Def.'s Second Mot. in Limine and for Disqual., Court No. 07-00318, ECF No.

163) to exclude Plaintiff's counsel, Mr. Teufel, until such time as Plaintiff might actually

seek, at trial, to introduce testimony from Mr. Teufel.  (Slip Op. 11-60, May 26, 2011,

Court No. 07-00318, ECF No. 189.)

*International Custom Products, Inc. v. United States*                          Page 12
Court No. 07-00318

As for exhibits, those issues were resolved prior to trial, with the exception of

Plaintiff's Ex. 18. After motion practice and discussions between the parties and the

Court as to the admissibility of paper exhibits and deposition transcripts, the parties

each moved in colloquy immediately prior to the beginning of trial to admit a particular

set of exhibits to which the other party did not object. Upon consideration of the

consent of the parties and upon the Court's own consideration of the admissibility of

the exhibits, the Court admitted into evidence Plaintiff's Exhibits 1–7, 9, 12–13, 15–16,

19, 21, 23, 25–27, 30–34, 44, 50a–50ppppp, 51–59, 62–64, 66, 68–74, 77–78, 80–81, 85,

88–89, 93–94, 96, 98, 100, 105–107, 237, 242–243, 253, 255–258, 277, and 281–282; and

Defendant's Exhibits A–HH, KK–OO, and RR–DDD. (Tr. 6–15; Pretrial Order, Court

No. 07-00318, ECF No. 235, Attachs. 1–5.)[6] The Court took testimony regarding

Plaintiff's Ex. 18 (production "make sheets" from the files of the New Zealand-based

manufacturer of white sauce) and admitted that exhibit over Defendant's hearsay

objection. (Tr. 195–197.)

---

[6] A color-coded chart of all proposed exhibits was incorporated into the Pretrial
Order in lieu of Pretrial Order Scheds. H-1 and H-2. (Court No. 07-00318, ECF No. 235,
Attachs. 1–5.) This chart marked each exhibit in either light or dark green (stipulated to
by the parties), yellow (status to be determined at the opening of trial), or red
(withdrawn by the parties). The Court had indicated to the parties on the chart the
manner in which it intended to rule should a decision be required on the dark green or
red entries, but the necessity for the Court to issue those rulings was avoided by the
stipulations and withdrawals of the parties.

*International Custom Products, Inc. v. United States*                    Page 13
Court No. 07-00318

## B.    Pretrial Order

A pretrial order in this case was entered on January 25, 2012. (Pretrial Order,

Court No. 07-00318, ECF No. 235.) Plaintiff and Defendant outlined the issues for trial

in their respective Pretrial Order Schedules. (Pretrial Order, Court No. 07-00318, ECF

No. 235, Scheds. F1 and F2.) To ensure that the relevant legal and factual issues were

properly framed prior to trial, the Court distributed an outline of relevant issues to the

parties at a pretrial conference on November 17, 2011, and the parties confirmed their

agreement.

### 1.    Issues for Trial

The principal issues to be decided are (1) whether the white sauce in the Entry

conformed with the Ruling Letter and (2) whether the Ruling Letter was invalid due to

material false statements or omissions made by ICP in seeking it. (Id.)

As to whether the white sauce in the Entry conformed with the Ruling Letter,

there are two relevant questions: (a) did the white sauce in the Entry contain CMC and

xanthan gum, and (b) did the white sauce in the Entry contain between 72% and 77%

milkfat. A subsidiary question is whether the Entry failed to materially conform to the

Ruling Letter if its milkfat content was above 77%.

As to whether the Ruling Letter is invalid due to material false statements or

omissions made by ICP, three questions are relevant: (a) did ICP fail to disclose its

knowledge as to the typical use of white sauce; (b) did ICP fail to disclose all the

commercial, common, and technical designations for white sauce; and (c) did ICP

mislead Customs as to the purpose of the ingredients in white sauce. (Pretrial Order,

Court No. 07-00318, ECF No. 235, Sched. D2 at ¶ 2.)

    2.    Uncontested Facts

Certain basic facts regarding this case were agreed upon between the parties in

the pretrial order. (Pretrial Order, Court No. 07-00318, ECF No. 235, Sched. C.) Those

facts are as follows. Dennis Raybuck is the President and founder of ICP, an importer

and distributor of dairy products, including white sauce, to manufacturers of food

products. (Id. at ¶¶ 1–3.) White sauce is a milkfat-based product that serves as the base

and can be an ingredient for products including, but not limited to, gourmet sauces,

salad dressings, processed cheeses, club cheese preparations, other sauces, and baked

goods. (Id. at ¶¶ 4–5.)

In 1998, ICP sought a binding tariff classification ruling from Customs, stating in

its request that white sauce "may be used as the base for a gourmet sauce or salad

dressing" and "is the commercially recognized formulated sauce preparation which

*International Custom Products, Inc. v. United States*    Page 15
Court No. 07-00318

serves as the base for production of gourmet sauces and dressings." (Id. at ¶¶ 6–8.) A

specification sheet for white sauce, attached to ICP's ruling request, stated that white

sauce "has been properly acidified and contains all of the necessary thickeners and

emulsifiers needed for the further production of gourmet sauces and dressings," which

was given as white sauce's "[t]ypical usage." (Id. at ¶¶ 9–10.) According to the

specification sheet, the "producer of gourmet sauces and dressings need only add the

proper flavoring compounds necessary for the production of their specific sauce or

dressing." (Id. at ¶ 11.) The specification sheet also listed, under the heading "TYPICAL

ANALYSIS," milkfat content of 72%–77% and ingredients as "Milkfat, Water, Vinegar

(and/or lactic acid and/or citric acid), Zanthum [sic] gum, Carboxymethelcellulose [sic],

Sodium Phosphate and/or Sodium Citrate."[7] (Id. at ¶¶ 12–13.) ICP also submitted a

sample of white sauce with the ruling request. (Id. at ¶ 15.) Customs issued the Ruling

Letter on January 20, 1999, classifying the product described in the ruling request in

HTSUS 2103.90.90, providing for "[s]auces and preparations therefor; . . . : [o]ther:

[o]ther: [o]ther: [o]ther," with a duty rate of 6.6% ad valorem. (Id. at ¶ 16–17.)[8]

---

[7] "Zanthum gum" is an incorrect spelling of xanthan gum and
"Carboxymethelcellulose" is an incorrect spelling of carboxymethylcellulose, i.e., CMC.
Id. at ¶ 14.

[8] That tariff rate was reduced to 6.4% ad valorem in the 2005 HTSUS. (Id. at
¶ 18.)

Beginning in early 2000, ICP purchased property to build a manufacturing facility, but production did not begin until the first quarter of 2005 due to a lawsuit and sewer and zoning problems. (Id. at ¶¶ 26–32.)

Customs tested three samples of ICP's imported white sauce between 2000 and 2007. (Id. ¶ 34.) In 2001, Customs requested the breakdown of a sample, asking "DOES IT CONTAIN MILK OR CHEESE?" (Id. at ¶ 36.) The lab reported that the 2001 white sauce sample contained 72.97% milkfat and concluded that "Fat and Moisture analyses indicates [sic] that the sample contains 73% fat and 23% moisture which is consistent with the information provided by the importer. Information from the importer indicates the sample contains 77% [milk]fat, 21% moisture, and 2% (Lactic acid, zanthum [sic] gum, carboxymethelcellulose [sic], sodium phosphate and sodium citrate)." (Id. ¶ 37–38.)

A second white sauce sample was tested to verify the ingredient breakdown in late 2004; two reports concluded that the milkfat content of this sample was approximately 78%. (Id. ¶¶ 39–41.) Certificates of analysis for the entry from which the 2004 sample was taken indicate milkfat content of 77.3% and 78.1%, calculated using a technique called the "by difference" method. (Id. at ¶ 48.) The data attached to the 2004 and 2005 reports on the 2004 sample list slightly varying percentages of both milkfat

*International Custom Products, Inc. v. United States*                                                    Page 17
Court No. 07-00318

and butyric acid (a measurement that allows for conversion of tested crude fat levels

into milkfat levels). (Id. ¶¶ 42–47.) The butyric acid levels given with the lab reports

lead to a calculation that more than 100% of the sample's crude fat consists of milkfat.

(Id. at ¶¶ 45–47.)

Customs sent a final white sauce sample for testing in 2007 in order to verify its

ingredient breakdown, specifically requesting that the ingredients on the specification

sheet be verified and that the lab determine whether the white sauce was an emulsion

(and if so, of what type). (Id. at ¶¶ 51–52.) For the 2007 sample, the lab determined a

milkfat content of approximately 76.58%, rounded up to 77% in the lab report, which

was 1.52% less than the milkfat percentage stated in the certificate of analysis

accompanying the entry. (Id. at ¶¶ 53–56.) The average lab findings of milkfat content

in the 2001, 2004, and 2007 samples was 75.84%. (Id. at ¶ 58.)

On an unspecified date, ICP created for its main customer, Schreiber Foods

("Schreiber") (the company that purchased the Entry) a white sauce specification sheet

which did not list xanthan gum or CMC as ingredients. (Id. ¶ 21–22.)

Customs liquidated the Entry under HTSUS 0405.20.30 on June 29, 2007; ICP

timely protested liquidation, the protest was deemed denied, and ICP paid the assessed

duties of $66,602.32 by August 27, 2007. (Id. at ¶¶ 23–25.)

*International Custom Products, Inc. v. United States*                               Page 18
Court No. 07-00318

### III. TRIAL

The trial of this matter was held before the undersigned at the Court of

International Trade on February 6–10, 2012.

### A.     Trial Exhibits

As mentioned above, in colloquy at the commencement of the trial the Court

granted Plaintiff's unopposed motion to enter into evidence Plaintiff's Exhibits 1–7, 9,

12–13, 15–16, 19, 21, 23, 25–27, 30–34, 44, 50a–50ppppp, 51–59, 62–64, 66, 68–74, 77–78,

80–81, 85, 88–89, 93–94, 96, 98, 100, 105–107, 237, 242–243, 253, 255–258, 277, and

281–282; and Defendant's Exhibits A–HH, KK–OO, and RR–DDD. (Tr. 6–15; Pretrial

Order, Court No. 07-00318, ECF No. 235.) The Court heard testimony from Dennis

Raybuck, the CEO of ICP, that Plaintiff's Exhibit 18 contained production control sheets,

also called make sheets, from a plant run by ICP's New Zealand based white sauce

supplier. (Tr. 103.) Mr. Raybuck testified that he visited the plant at least once a year

and looked at make sheets during his visits. (Tr. 105.) Mr. Raybuck stated that shift

supervisors in charge of running the plant prepared the make sheets

contemporaneously with production, recording information within their direct

knowledge, and that the make sheets were kept in the regular course of business. (Tr.

104-05.) On voir dire, Mr. Raybuck stated that he examined the make sheets in batches

*International Custom Products, Inc. v. United States*                                    Page 19
Court No. 07-00318

for approximately one hour during his visits to ICP's supplier's plants, did not

personally fill out the make sheets, never worked for or held an ownership interest in

the supplier company, and did not know what rules the supplier had regarding how the

make sheets were to be filled out. (Tr. 105-09.) The government moved to exclude

Plaintiff's Exhibit 18 on hearsay grounds, arguing that the make sheets were unreliably

filled-out and that Mr. Raybuck could not establish a business records exception

because he did not work for the white sauce supplier company. (Tr. 109.) The Court

admitted Plaintiff's Exhibit 18 into evidence under Federal Rule of Evidence 803(6), the

business record exception to the hearsay rule. (Tr. 195-96.) The Court found that Mr.

Raybuck was a qualified witness as to the regularity of the records, and his testimony

established that the make sheets were made at or near the time, by (or from information

transmitted by) someone with white sauce production knowledge and were kept in the

ordinary course of business as a regular practice. (Tr. 196-97.) The Court found that the

government's objection that the records were not filled out in a reliable manner went to

weight, not admissibility. (Tr. 197.)

*International Custom Products, Inc. v. United States*          Page 20
Court No. 07-00318

### B.    Trial Testimony

Because the parties included many of the same witnesses on their witness sheets,

the Court allowed the witnesses to be called only a single time and gave the parties

latitude in their questioning.

Plaintiff called Dennis Raybuck, the president and CEO of ICP, as both a fact

witness and an expert witness (Tr. 92–463, 597–709, 817–23, and 1088–1117); Donald B.

Learmonth, an executive with Fonterra and associated companies that supplied ICP's

white sauce, as a fact witness (Tr. 465–502); Stanley Hopard, a former Customs National

Import Specialist who authored the Ruling Letter, as a fact witness (Tr. 503–75); Leslie

Aita, a Customs Import Specialist involved in the investigation that led up to Customs

issuing the Notice of Action, as a fact witness (Tr. 576–96); Alexander J. Costigan, former

owner of Level Valley Creamery, as a fact witness (Tr. 710–30); and Gerd Stern, the

former owner of companies that were early suppliers of ICP's white sauce, as a fact

witness (Tr. 730–64).

Defendant called Diane Kutskel, Mr. Raybuck's former assistant at ICP, as a fact

witness (Tr. 766–815); John G. McManus, director of purchasing for Schreiber Foods

from 1998–2004, as a fact witness (Tr. 832–69); Julian B. Heron, an attorney who

represented ICP in the past and who prepared the Ruling Request, as a fact witness (Tr.

*International Custom Products, Inc. v. United States*                    Page 21
Court No. 07-00318

870–85); Cheryl Glenzer, a former senior ingredients purchaser for Schreiber Foods

from 1989–2006, as a fact witness (Tr. 886–903); and Dr. Robert L. Bradley, Jr., a dairy

professor at the University of Wisconsin, as an expert witness (Tr. 904–1080).

## IV. FINDINGS OF FACT

Upon the trial record, the Court's consideration of the testimony taken, the

Proposed Findings of Fact submitted by the parties, and all other papers and

proceedings had in this matter, the Court hereby makes the following findings of fact.

### A.    Ingredients in the Entry

The Court finds that the white sauce in the Entry contained CMC and xanthan

gum in functional amounts, and an actual milkfat content under 77%.

####   1.    CMC and Xanthan Gum

CMC and xanthan gum serve to thicken liquids. (Tr. 163.) Mr. Learmonth and

Mr. MacBeth, employees of ICP's supplier, credibly confirmed that the supplier always

added CMC and xanthan gum to the white sauce it manufactured for ICP. (Tr. 479; Pl.

Ex. 9 at 50-1.) Mr. Raybuck provided ICP's supplier with the same specification sheet

for white sauce that was supplied to Customs with the Ruling Request (Tr. 225-26; Pl.

Ex. 2 at 3), and ICP instructed the supplier to include .2% CMC and .25% xanthan gum

so that the white sauce would contain thickeners in the middle of the functional range

*International Custom Products, Inc. v. United States*                    Page 22
Court No. 07-00318

(Tr. 203). When Mr. Raybuck used the white sauce in his test kitchen, it always

thickened upon heating and otherwise acted in a manner consistent with containing

CMC and xanthan gum in effective quantities. (Tr. 164-65.) Numerous certificates of

analysis ("COAs"), make sheets, and other documents recording the regular procedures

of ICP's white sauce supplier regarding batches of white sauce produced in the period

leading up to manufacture of the Entry, as well as of the Entry itself, confirm the

presence of CMC and xanthan gum in the white sauce generally and in the Entry

specifically. (Pl. Exs. 18, 31.) The Court finds that Plaintiff established with this

evidence that the Entry contained CMC and xanthan gum in functional quantities.

The Court also finds that ICP created a business, Giuseppe's Finer Foods, to

create a line of gourmet sauces from white sauce, and credits Mr. Raybuck's testimony

that ICP would have made three to four times as much money at this business than it

made selling white sauce to Schreiber. (Tr. 285-86.) The record shows that ICP built a

facility for the manufacture of these sauces. (Tr. 285-86, 298-307; Pl. Ex. 258.) The Court

finds ICP's actions consistent with a genuine intent to use white sauce in the manner

described in the Ruling Request, and further finds that removing CMC and xanthan

gum from white sauce would have prevented this use. This provides a further basis for

*International Custom Products, Inc. v. United States*                    Page 23
Court No. 07-00318

the Court to credit Mr. Raybuck's testimony that CMC and xanthan gum were always

in the white sauce.

Although CMC and xanthan gum were removed from certain specification

sheets for ICP's white sauce (Pl. Ex. 21), Plaintiff established to the Court's satisfaction

that this change in documentation was merely an accommodation made to a customer,

and was not accompanied by a change in the actual ingredients of white sauce (Tr. 94-

100; Tr. 479; Pl. Ex. 9 at 50-1). The Court also credits Mr. Raybuck's testimony that CMC

and xanthan gum were removed from the Schreiber specification sheets after ICP's

then-attorney, Mr. Heron, told ICP that changing the specification was permissible. (Tr.

95, 100-01.) Although the government called Mr. Heron and he was unable to recall the

consultation, the government never established that the consultation did not occur. (Tr.

876-84.) But regardless of the question of whether ICP made the specification sheet

change upon legal consultation, the Court finds that the stripping of CMC and xanthan

gum from the specification sheets was done at the request of ICP's principal customer,

Schreiber, for sales purposes, and was not accompanied by a corresponding stripping of

those ingredients from the white sauce in the Entry.

Dr. Bradley testified that CMC and xanthan gum were not present in effective

concentrations in the Entry. (Tr. 944-45, 950-55.) The Court finds that testimony to be

unreliable and unconvincing.

It is worth examining at this point the reasons that the Court finds Dr. Bradley to

have been an unreliable witness. First, Dr. Bradley had financial motives to support the

government's position, as a long-term and frequent expert witness for the government.

(Tr. 963-69.) The mere fact that hired experts ordinarily have financial interest in

providing useful testimony to their clients does not typically lead the Court to question

the usefulness of an expert's conclusions. Dr. Bradley, however, attempted to

downplay the financial significance of his service as a government expert and the extent

of his ongoing involvement in such work. (<u>Id.</u> (testimony of Mr. Bradley, in which he

stated that he only worked as an expert for the government "[t]hree or four days a year,

maybe, at the most," later admitted that he was also paid to act as a consulting expert in

many other cases, yet answered "[n]one" to the number of cases in which he had served

as a consultant but not testified).) In addition, the Court finds that Dr. Bradley had a

partisan sympathy to the government's case that undercut the reliability of his expert

testimony. (<u>See generally</u> Tr. 1031-35.) Dr. Bradley declared, "I always maintain an

objective attitude." (Tr. 969.) That declaration was belied by Dr. Bradley's later

testimony to the Court that ". . . [w]hen [ICP] went to get the ruling, they only had

gourmet sauces and dressings on the recommended uses . . . . And then subsequently,

after talking with Schreiber, [ICP] amended that and added more uses . . . . if they had

gone for a ruling with all of those uses on, we might not be here today." (Tr. 1035.) Dr.

Bradley articulated a legal argument as to the inappropriateness of ICP's Ruling

Request during his testimony and, in doing so, a personal commitment to the

government's victory in this case. Dr. Bradley's advocacy was highlighted by the

urgent manner in which he spoke from the witness stand. Dr. Bradley was offered by

the government, and accepted by the Court, as an expert on "dairy processing, dairy

products, dairy testing" and "the use of pricing of butter and the pricing of white

sauce." (Tr. 940-41.) Yet he exceeded the accepted scope of expertise to lecture the

Court with his legal opinion as mentioned above. (Tr. 1035.) Dr. Bradley's expertise

also did not include sauces or dressings, or the use or detection of CMC and xanthan

gum in such products, yet he provided testimony about those questions despite

admitting that he had no expertise in commercial sauce or dressing production. (Tr. 929-

31, 933-34, 940-41, 950-55, 974, 979-81, 1041-55, 1077-79.) That testimony was not only

unhelpful, but also baseless. Dr. Bradley had neither a basis as an expert for opinions

on such issues nor any factual basis for the opinions he expressed in those portions of

*International Custom Products, Inc. v. United States*                    Page 26
Court No. 07-00318

his testimony. As a result, the Court finds Dr. Bradley's testimony about the amount

and function of CMC and xanthan gum in ICP's white sauce to be unpersuasive.

2.    Milkfat Content

The Court finds that the Entry contained milkfat in a concentration between 76%

and 77%. Direct evidence on the milkfat content of the Entry exists in the COAs made

at the time the Entry was manufactured and shipped from the supplier. (Pl. Ex. 27 at

ICP001393-94.) The Entry consisted of 1120 cartons of white sauce, each weighing 25

kilograms. (Id.) The Entry contained 1099 cartons from a batch of white sauce with a

COA showing a milkfat content of 77.3%, and 21 cartons from a batch of white sauce

with a COA showing a milkfat content of 77.4%. (Id. at ICP001390.) This milkfat

percentage was calculated using the "by difference" method, which estimates milkfat

concentration by removing moisture from the sample and assuming that the remainder

is comprised solely of milkfat. (Tr. 165-66 (Mr. Raybuck); Tr. 480-81 (Mr. Learmonth).)

"By difference" calculations overstate the actual milkfat content slightly, because it

lumps contents such as CMC, xanthan gum, and other additives in white sauce into the

milkfat percentage. (Id.) This is shown by Customs's own laboratory tests of ICP's

white sauce during the course of importation. For example, the COA for one of ICP's

importations of white sauce showed a milkfat concentration, calculated "by difference,"

of 78.1% (Pl. Ex. 58), but testing by a Customs laboratory of a sample from that

shipment of white sauce showed an actual milkfat concentration of 76.6%, rounded up

for purposes of the lab report to 77% (Pl. Ex. 7). A 2001 laboratory test by Customs had

similar results, determining actual milkfat concentrations of an ICP white sauce sample

to be more than 4% lower than the percentage "by difference" stated on the COA. (Pl.

Ex. 4.) In sum, the Court credits the exhibits and testimony that the "by difference"

method overstated milkfat concentrations in ICP's white sauce imports by at least .75%.

Consequently, the Court finds that the actual milkfat concentration of the white sauce in

the Entry was approximately 76.65%, and therefor fell within the range of "typical"

milkfat concentration for white sauce provided in the Ruling Letter.

The Court also finds that, even if the Entry contained a milkfat concentration

slightly above 77%, as claimed by the government, the overage would be immaterial.

Evidence supporting this finding of fact is contained in the Customs laboratory reports

at Plaintiff's Exhibits 5-6. These reports were issued in response to a request that the

laboratory test a sample of ICP's white sauce for classification and conformance with

the Ruling Letter. (Id.) While the Court agrees with Plaintiff that the test results contain

internal inconsistencies that make the conclusion as to actual milkfat content unreliable,

the reports nonetheless determined that white sauce samples containing 78% milkfat

*International Custom Products, Inc. v. United States*                    Page 28
Court No. 07-00318

conformed to the Ruling Letter. (Id.) Additionally, Mr. Hopard, who drafted the

Ruling Letter, testified that no specific milkfat concentration or range of concentration

was necessary for conformance with the Ruling Letter. (Tr. 506-07.) Mr. Hopard also

testified that, when the Customs laboratory determined that samples of ICP's white

sauce contained between 77% and 78% milkfat, Customs believed that "[i]t was

consistent" with the ingredients of white sauce as stated by ICP. (Tr. 525.) Thus the

Court finds that Customs believed that the Ruling Letter properly applied to ICP white

sauce even when that white sauce contained a milkfat concentration of 78%.

In sum, the Court concludes that the Entry physically conformed to the Ruling

Letter because it contained CMC and xanthan gum in functional quantities and

contained milkfat in an amount consistent with the typical range.

**B.    How the Ruling Letter Was Obtained**

As an affirmative defense, the government claimed that the Ruling Letter was

void ab initio because ICP made material misrepresentations and omissions when it

applied for the Ruling Letter. Examining the record, the Court finds that ICP

adequately informed Customs of the typical uses of white sauce; the common,

commercial, and technical designations for white sauce; and the purpose of the

ingredients in white sauce when it applied for the Ruling Letter. Therefore, the Ruling

*International Custom Products, Inc. v. United States*                    Page 29
Court No. 07-00318

Letter was valid at the time of the Entry and was not void ab initio, as claimed by the

government.

  1. Contents of the Ruling Request

  As an initial matter, it is important to describe exactly what the Ruling Request

contained.

  First, the packet contained a letter to Customs dated December 21, 1998, stating

that ICP's white sauce "may be used as the base for a gourmet sauce or salad dressing"

and "is the commercially recognized formulated sauce preparation which serves as the

base for production of gourmet sauces and dressings." (Pl. Ex. 2 at ICP000001.)

  Second, a specification sheet described white sauce by stating that it "has been

properly acidified and contains all of the necessary thickeners and emulsifiers needed

for the further production of gourmet sauces and dressings," which was given as white

sauce's "[t]ypical usage." (Id. at ICP000003.) Under the heading "TYPICAL

ANALYSIS," the specification sheet gave milkfat content of 72%–77% and ingredients of

"Milkfat, Water, Vinegar (and/or lactic acid and/or citric acid), Zanthum [sic] gum,

Carboxymethelcellulose [sic], Sodium Phosphate and/or Sodium Citrate." (Id.)

  Next, two recipes incorporating white sauce were provided, one for "Gourmet

Hollandaise Sauce" and one for "Gourmet Salad Dressing."

*International Custom Products, Inc. v. United States*                Page 30
Court No. 07-00318

Then, an October 1998 article in a food industry magazine entitled "Secrets to

Sauce Success" was included.  The article "Secrets to Sauce Success" quotes a Kraft Food

Ingredients employee, who describes the beginning stage of making a sauce this way:

> [Y]ou're going to make a white sauce, and the white sauce is just a
> thickening system. [. . .]  And you're going to build into that thickening
> system any special functionality you need, including flavor.  But if you're
> building a decent white sauce, it's going to have just about all the
> functionality you need.

(Id. at ICP000006.)  The article goes on to describe the use of stabilizers, such as xanthan

gum and CMC.  (Id. at ICP000006-10.)  Regarding the final stage, flavoring the sauce,

the article discusses the growing popularity of cheese-flavored and cheese sauces, and

mentions that "sauces can run the gamut from high-fat cheese-based and cream-based

sauces to nonfat gravies."  (Id. at ICP000011.)

The final two items in the Ruling Request were a physical sample of white sauce

and a price quote for white sauce from an Israeli supplier.  (Pl. Ex. 2 D, E.)

　　　2.　　Known Typical Uses of White Sauce

The Court finds that ICP provided adequate information regarding the principal

use of white sauce in the Ruling Request.

In its Ruling Request, ICP informed Customs in numerous ways that white sauce

was "the commercially recognized formulated sauce preparation which serves as the

base for production of gourmet sauces and dressings" and that it "may be used as the

base for gourmet sauce or salad dressing." (Id. at ICP000001) (emphasis added). The

included specification sheet added the information that white sauce "has been properly

acidified and contains all of the necessary thickeners and emulsifiers needed for the

further production of gourmet sauces and dressings." (Id. at ICP000003.) Usage as a

"base sauce preparation for gourmet sauces and dressings" is described as typical. (Id.)

The attached recipes gave specific examples of these typical uses, and the article made

clear that professionals in the sauce industry saw a "decent white sauce" as the basis

upon which any of a variety of different sauces could be made. (Pl. Ex. 2 C.) Mr.

Raybuck, who was qualified as an expert on sauce making, testified that manufacturers

of sauces and dressings had been creating an industrial version of white sauce since the

early 20th century and that he had seen this white sauce used in making hollandaise

sauce and vodka sauce. (See, e.g., Tr. 156-60.) The Court credits this testimony and the

submissions in the Ruling Request, especially as the trade magazine article provides

strong independent corroboration for Mr. Raybuck's statements. The Court therefore

finds that ICP accurately described the use of white sauce when it submitted the Ruling

Request to Customs.

*International Custom Products, Inc. v. United States*                    Page 32
Court No. 07-00318

The government pointed, however, to several ICP-produced specification sheets

for white sauce listing possible uses different from the principal use as a base for sauces

and dressings described in the Ruling Request. The stand-out among these is an early

white sauce specification sheet ICP gave to Kraft Foods during business negotiations

shortly before ICP submitted its Ruling Request—negotiations that were never

consummated. (Def. Ex. S.) This specification sheet bears the date August 1, 1998 and a

fax header showing it was faxed to Kraft on October 7, 1998, about two and a half

months before ICP submitted its Ruling Request to Customs. (See id., Pl. Ex. 2.) It

describes white sauce as "the food product made from fresh cream and other high

quality ingredinets [sic] via a proprietary process . . . [and] used as a base sauce

preparation for any sauce or dressing that is in need of this particular taste profile."

(Def. Ex. S.) Recommended usage is given as "an ingredient in baked goods and butter

based sauces." (Id.) This specification sheet, unlike all others in the record, contains a

disclaimer that reads, "[t]his information is presented for consideration in the belief that

it is accurate and reliable" but stating that "no warranty, either express or implied is

made . . . ." (Id.) Within days before ICP faxed Kraft this specification sheet, the two

companies entered into a "Confidential Disclosure Agreement" to share information

*International Custom Products, Inc. v. United States*                    Page 33
Court No. 07-00318

regarding a process ICP had developed to import a product and convert it into

anhydrous milkfat (AMF), and which Kraft wished to evaluate.  (Def. Ex. RR.)

Plaintiff submitted a collection of eleven specification sheets into the record, each

describing white sauce as "the commercially recognized formulated sauce preparation

which serves as the base for the production of gourmet sauces and dressings" and

indicating that "[t]ypical usage is as a base sauce preparation for gourmet sauces and

dressings."  (Pl. Ex. 21.)  These specification sheets are, in these regards, identical to the

specification sheet submitted by ICP with its Ruling Request.  (Compare Pl. Ex. 2

(Ruling Request) with Pl. Ex. 21.)  However, five of the specifications sheets in Pl. Ex. 21

include an additional sentence in the recommended usage section:  "Other uses include

processed cheese sauces, processed cheese and club cheese preparations."  (Pl. Ex. 21,

pages marked in lower right corner "LV1143," "080," "085," "275," and "0850.") The

Court finds that the specification sheets with the "processed cheese" language were

provided to customers on or after September 7, 1999.[9]  (Id.)  As such, these specifications

sheets were employed after the Ruling Letter had already been issued.

_____

[9] Although many of the specification sheets are marked, incorrectly, with dates in
1998, those sheets contain fax headers showing when they were provided to Schreiber.
None of the fax headers predates September 7, 1999.  The only specification sheet
without a fax header bears a date from 2003.

*International Custom Products, Inc. v. United States*                    Page 34
Court No. 07-00318

Mr. Hopard credibly testified that, in issuing the Ruling Letter, he relied on the

accuracy of ICP's representations in the Ruling Request as to the principal use of white

sauce, as required by regulation. (Tr. 549-50.) Mr. Hopard examined the various

specification sheets for white sauce and testified that his decision would have taken into

consideration the alternative uses of white sauce given there, had those alternative uses

been disclosed. (Tr. 555-65.) During the government's examination of Mr. Hopard, he

was presented with a hypothetical question as to whether he would have classified

white sauce differently if he had seen all of the various uses referred to in the

specification sheets post-dating the ruling letter, and he answered that he would have.

(Tr. 565.) However, Mr. Hopard later clarified that "if the greatest use in the United

States of this so-called white sauce was to make sauce preparations, then that would be

a factor in calling that the principal use" despite the other potential uses. (Tr. 571.)

The "principal use" question was a central topic of Mr. Hopard's testimony,

since, as he repeatedly emphasized, the principal use of the class or kind of goods to

which a product belongs is "very critical" when classifying that product. (See, e.g., Tr.

553.) But the Court will perhaps be forgiven this observation: deciding the critical

question of the classification of a good in a principal use provision of the tariff appears

to be an almost ineffable experience on a par with describing the sound of one hand

*International Custom Products, Inc. v. United States*                    Page 35
Court No. 07-00318

clapping.[10] Mr. Hopard confirmed that the process contains two steps: first, to identify

the class or kind of good to which the product in question belongs; and second, to

determine what the principal use of that class or kind of goods is. (Tr. 519-20.)

Mr. Hopard struggled, however, to articulate how the first step would be

conducted. For example, he stated, "Well, class or kind is broad in scope . . . [and]

includes products that are . . . not necessarily identical, but have similar characteristics."

(Tr. 515-16.) As to defining this in a particular case, "there are no definite steps," but it

is a "question of the type of product presented to you" and how it "relates to others you

have seen" or "other types of products you have done research on and so forth." (Tr.

516.) Class or kind is "broader and not just the product in front of you," which takes

some burden off the importer to be responsible for the actual use of a particular

importation. (Tr. 541.)

Furthermore, Mr. Hopard was unaware of the government ever having done any

class or kind determination with regard to white sauce. (Tr. 516-17.) To his knowledge,

no inquiries to any other sauce makers were made to determine whether or not white

---

[10] This should not be taken as an indication that Mr. Hopard was not a credible
witness. Overall, the Court found Mr. Hopard to be informative and helpful, with a
refreshing dedication to providing honest testimony evidenced in the way he fully
engaged the questions put to him and provided clear answers without shying away
from nuance during examination by the attorneys for both parties.

*International Custom Products, Inc. v. United States*                    Page 36
Court No. 07-00318

sauce was of the class or kind of goods used in the preparation of sauces. (Tr 521.) In

the absence of other evidence of a class or kind investigation, the Court finds that the

government never determined what class or kind of good white sauce belonged to.

As for the second step of a principal use determination, identifying the principal

use of the class or kind of good to which a product has been determined to belong,

principal use is "defined in the tariff" as "a use of a product that exceeds all other uses

. . . in the United States of the class or kind of good" to which the product in question

belongs. (Tr. 515.)

Mr. Hopard described implementing that process in a manner that leads the

Court to find that it was more a matter of intuition that rigorous analysis. For example,

Mr. Hopard stated that "[y]ou decide it based upon the identity of the product, how it's

going to be used, where similar products have been used in industry and such. That's

kind of how you get the feel of that." (Tr. 559) (emphasis added). It is "a decision I

make based upon the facts presented to me and my knowledge of other types of

products that fall into that general category of good." (Tr. 559-60.) It is "based upon

what other independent research and knowledge you gain being on the job, you

discover certain similarities in types of products." (Tr. 564.) Mr. Hopard also testified

that, contrary to an actual use tariff provision, a primary use provision gives an

importer more leeway because the actual use of a particular entry is not determinative.

(See Tr. 541.)

After carefully considering all of the testimony from Mr. Hopard, the former

official who was responsible for conducting the analysis of principal use and drafting

the Ruling Letter, the Court finds that Defendant has failed to show that the Ruling

Letter was obtained by false information or material omissions from ICP regarding the

principal use of the class or kind of goods to which white sauce belongs.

    3.    Common, Commercial, and Technical Designations for White Sauce

The Court finds that ICP provided Customs with adequate information about the

common, commercial, and technical designations for white sauce at the time at which

ICP applied for its ruling letter. This has already been shown by the evidence

establishing that white sauce is used by manufacturers as a base for the creation of

sauces and dressings as described in, for example, the article included with the Ruling

Request.

Defendant's challenges on this issue point out that ICP failed to tell Customs in

the Ruling Request about alternative names used by other companies to refer to ICP's

white sauce. Plaintiff does not contest that Schreiber referred to ICP's white sauce by a

Schreiber-chosen designation "CMF-403," incorporating the acronym for concentrated

*International Custom Products, Inc. v. United States*                                 Page 38
Court No. 07-00318

milkfat. (Tr. 622-23 (Mr. Raybuck).) However, the Court finds no evidence in the

record that ICP provided paperwork to Schreiber using the CMF designation for white

sauce earlier than 2003 and therefore could not have informed Customs about that

designation in the 1998 Ruling Request. (Pl. Ex. 2; Def. Ex. EE.) The Court also finds

that ICP did not control the terminology employed by Schreiber, but merely complied

with its customer's request to use a preferred designation on paperwork when the two

companies did business. (Tr. 622-23.) It is also important to note that the name of a

product in a ruling request is "really not very important" and "is not something that

has great weight" in determining classification, according to Mr. Hopard. (Tr. 551-52.)

Therefore, the Court finds that ICP did not omit material information from the Ruling

Request by failing to tell Customs about other names used for white sauce.

    4.    <u>Purpose of the Ingredients in White Sauce</u>

      The government contends that ICP designed white sauce as a vehicle to sneak

large amounts of milkfat into the US without paying the properly-applicable duties or

falling under the applicable quotas, and never intended to manufacture it into sauces or

dressings. (Def.'s Post Trial Findings of Fact and Conclusions of Law at 19, Court No.

07-00318, ECF No. 251.) The government's theory is that ICP therefor tried to maximize

the milkfat content of white sauce and minimize the other ingredients.

*International Custom Products, Inc. v. United States*          Page 39
Court No. 07-00318

Contrary to the government's contentions, the Court finds that ICP genuinely

intended to use its imports of white sauce as a base for the manufacture of gourmet

sauces and dressings. This is established by credible evidence on the record that ICP

created a subsidiary, Giuseppe's Finer Foods, intended to produce gourmet sauces and

dressings from white sauce. (Tr. 132-35, 286.) ICP also struggled through logistical

difficulties to build, at great expense, a large production facility at which it intended to

produce gourmet sauces and dressings (Tr. 286, 298-307, Pl. Ex 258). ICP formulated an

Awesome Aussie Grilling Sauce and an Awesome Aussie Seafood Sauce, and had

discussions with both Outback Steakhouse and Red Lobster restaurants about

supplying those products. (Tr. 285-86.) Mr. Raybuck testified that, "had we been able

to accomplish that . . . we would have made about three or four times on [white sauce]

than what we were doing just selling it to someone else. So that was always our interest

in doing that." (Tr. 286.) The Court credits Mr. Raybuck's testimony, and finds that ICP

genuinely intended to use its white sauce in the manner described in the Ruling Request

and allowed by the Ruling Letter.

Testimony from Diane Kutskel, who was subpoenaed and testified involuntarily,

implied otherwise. (Tr. 765-815.) Ms. Kutskel was Mr. Raybuck's only employee at ICP

for the first few years after its inception; she started as secretary and eventually handled

*International Custom Products, Inc. v. United States*                          Page 40
Court No. 07-00318

many varied administrative responsibilities. (Tr. 768-69.) According to Ms. Kutskel,

Mr. Raybuck "told me, because it always had to be kept very secretive, but he basically

told me that [white sauce] was just another way to bring in butter." (Tr. 775.) She also

claimed that Mr. Raybuck told her that ICP's $65 million production plant was built as a

cover for continuing to import white sauce. (Tr. 798-99.)

Two reasons that the Court does not credit Ms. Kutskel's testimony bear

discussing. Firstly, Ms. Kutskel is an unreliable witness given that she and Mr. Raybuck

appear to have had an extremely bitter falling out over her abrupt termination from ICP

in 2003. (Tr. 778-82.) Ms. Kutskel denied holding a grudge or continuing to be angry

due to this falling out. (Tr. 785, 814-15.) But that denial was completely undercut by

Ms. Kutskel's demeanor, which alternated between sharp and tearful while testifying,

and made clear to the Court that the more than eight years between her severance from

ICP and her testimony had not resolved her ongoing anger and sadness toward Mr.

Raybuck. (Tr. 780-82, 800-05.) Secondly, and perhaps more importantly, the Court

finds that Ms. Kutskel did not make precise distinctions between the terms butter,

margarine, and white sauce in a manner according with the precise ways those terms

are understood within Customs law. This sort of slipping from precise to casual

terminology by Ms. Kutskel in regard to white sauce is exemplified by a portion of her

*International Custom Products, Inc. v. United States*　　　　　　　Page 41
Court No. 07-00318

testimony in which she admitted that she had freely intermixed the terms butter and

margarine when interviewed by a investigator from the Department of Homeland

Security Immigration and Customs Enforcement Bureau. (Tr. 794-97.) Due to this

tendency toward imprecise use of language and paraphrasing, the Court finds Ms.

Kutskel's testimony about butter and white sauce unreliable in resolving the legal issues

at hand.

The Court has already found that the white sauce in the Entry conformed with

the Ruling Letter by containing xanthan gum and CMC in functional amounts and

milkfat within the typical range described in the Ruling Letter. Consistent with those

findings, the Court finds no evidence in the record establishing that ICP removed any

non-milkfat ingredients from its white sauce.

As to minimizing non-milkfat ingredients in white sauce, the government makes

much of a specification sheet ICP provided to Schreiber on which the ingredients

xanthan gum and CMC are not listed. The government suggested, but did not

demonstrate, that ICP removed these ingredients from the white sauce entirely.

However, the Court credits Mr. Raybuck's testimony that he consulted ICP's then-

attorney, Mr. Heron (see supra, p. 23) and as a result believed that the FDA did not

object to removing CMC and xanthan gum from the Schreiber specification sheets on

*International Custom Products, Inc. v. United States*                                   Page 42
Court No. 07-00318

the ground that they were present in small enough quantities that they need not be
mentioned for labeling purposes. (Tr. 94-98.)

There is no credible evidence on the record from which the Court could conclude
that removing CMC and xanthan gum on a specification sheet for FDA labeling
purposes had any material relevance to the classification decision. Although Dr. Bradley
testified to the effect that CMC and xanthan gum were present in such small quantities
as not to be functional, this testimony is unpersuasive and outside Dr. Bradley's expert
competence as the Court has previously indicated. (Tr. 944, 950-55.)

In any case, the Court finds that Schreiber's request to remove references to CMC
and xanthan gum from specification sheets was made shortly before October 5, 1999,
and thus post-dated the Ruling Request and could not have been anticipated and
disclosed at the time the request was submitted. (Tr. 94-95.)

The Court has already found that the milkfat content of white sauce remained
between the 72% and 77% described in the specification sheet included with the Ruling
Request—a finding that runs counter to the government's suggestion that ICP
attempted to maximize the milkfat content of white sauce. The government's view is
also inconsistent with the testimony of Mr. Hopard, who testified that the exact quantity
of fat in the white sauce, whether derived from milk or another source, was not

*International Custom Products, Inc. v. United States*          Page 43
Court No. 07-00318

necessary for conformance with the Ruling Letter. (Tr. 507.) Additionally, Mr. Hopard

testified that "[i]ngredients for sauces are very, very varied" and can range "all over the

lot" and still be classified as a sauce preparation. (Tr. 564.) From this, the Court finds

that ICP could have simply submitted a request for white sauce to include more milkfat

in the first place, rather than obtaining a ruling for a lower amount and later

surreptitiously increasing it by as little as 1%. To do so would simply make no sense.

### V. POST-TRIAL SUBMISSIONS

Following the trial, the parties agreed to forego closing arguments and, in their

stead, to provide the Court with Proposed Findings of Fact and Conclusions of Law.

These were submitted on April 5, 2012 (Court No. 07-00318, ECF No. 250, by Plaintiff,

and Court No. 07-00318, ECF No. 251, by Defendant).

Thereafter, on June 6, 2012, the Court sent a letter requesting that the parties

provide briefs addressing the following issues: the manner of determining to which

class and kind of good a particular piece of merchandise belongs; classification of

merchandise under a principal use provision where (a) the product is used

commercially but has never previously been offered for sale, and (b) the product is a

new type of merchandise; the effect of evolution in the principal use of a class or kind of

merchandise on a binding ruling letter issued prior to that change; and the legal status

*International Custom Products, Inc. v. United States*          Page 44
Court No. 07-00318

of an interpretive ruling or decision which effectively results in retroactive and

prospective refusal by Customs to abide by a binding ruling letter when that

interpretive ruling or decision is issued without the notice and comment procedures

required by 19 U.S.C. § 1625(c)(1). (Letter Concerning Post-Trial Briefs, Court No. 07-

00318, ECF No. 253.)

        The parties submitted their briefs on June 27, 2012 (Court No. 07-00318, ECF No.

255, by Plaintiff ("Pl.'s Post-Trial Brief"), and ECF No. 254, by Defendant ("Def.'s Post-

Trial Brief")). On July 2, 2012, Defendant moved to strike certain portions of Plaintiff's

Post-Trial Brief. (Def.'s Mot. to Strike, Court No. 07-00318, ECF No. 256.) Plaintiff filed

an opposition on July 23, 2012. (Court No. 07-00318, ECF No. 257.) Defendant's Motion

to Strike remains pending before the Court at this time.

VI. CONCLUSIONS OF LAW

**A.     Jurisdiction and Standard of Review**

        The Court has jurisdiction over Plaintiff's challenge to the liquidation of the

Entry underlying this case pursuant to 28 U.S.C. § 1581(a). In such a case, the Court

makes its determination *de novo* upon "the basis of the record made before the court."

28 U.S.C. § 2640(a); Park B. Smith, Ltd. v. United States, 347 F.3d 922, 924 (Fed. Cir.

*International Custom Products, Inc. v. United States*          Page 45
Court No. 07-00318

2003) (stating that the Court decides "civil actions that contest the denial of a protest"

on "a de novo basis.")

**B.    Conclusions of Law**

The Court now turns to legal conclusions that stem from the facts established in

the Court's findings. There are four main legal issues before the Court. First, the Court

must determine whether the Ruling Letter was void *ab initio* and therefore not binding

on Customs. Second, the Court must determine whether the Ruling Letter, if valid,

applied to the Entry. Third, the Court must determine whether the Notice of Action

violated 19 U.S.C. § 1625(c)(1) by effectively revoking the Ruling Letter with regard to

the Entry without first satisfying the notice and comment procedures specified in the

statute. Fourth, the Court must determine whether Plaintiff is entitled to a remedy and,

if so, the nature of that remedy.

1.    The Ruling Letter Was Not Void *Ab Initio*

The Court concludes that the Ruling Letter was not void *ab initio* as the Court has

found as a matter of fact that it was not obtained by material misstatement or omission.

This issue arises from the CBP regulations that set forth what to include in

classification ruling requests and how Customs is to make its determinations in

response. The regulations state that, "generally," "[e]ach request for a ruling must

*International Custom Products, Inc. v. United States*                                    Page 46
Court No. 07-00318

contain a complete statement of all relevant facts relating to the transaction" and the

"transaction to which the ruling request relates must be described in sufficient detail to

permit the proper application of relevant customs and related laws." 19 C.F.R.

§ 177.2(b)(1)–(2)(i). Specifically with regard to ruling requests seeking the proper

HTSUS classification of an import,

> the request for a ruling should include a full and complete description of the
> article and whenever germane to the proper classification of the article,
> information as to the article's chief use in the United States, its commercial,
> common, or technical designation, and, where the article is composed of two
> or more materials, the relative quantity (by weight and by volume) and value
> of each.

Id. § 177.2(b)(2)(ii)(A). In addition, ruling requests

> must state whether, to the knowledge of the person submitting the request,
> the same transaction, or one identical to it, has ever been considered, or is
> currently being considered by any Customs Service office or whether, to the
> knowledge of the person submitting the request, the issues involved have
> ever been considered, or are currently being considered, by the United States
> Court of International Trade, the United States Court of Appeals for the
> Federal Circuit, or any court of appeal therefrom.

Id. § 177.2(b)(5). As for how Customs decides such requests, CBP regulations provide

that Customs ruling letters are "[g]enerally"

> issued on the assumption that all of the information furnished in
> connection with the ruling request and incorporated in the ruling letter,
> either directly, by reference, or by implication, is accurate and complete in
> every material respect . . . . [I]f the transaction described in the ruling
> letter and the actual transaction are the same, and any and all conditions

*International Custom Products, Inc. v. United States*                    Page 47
Court No. 07-00318

> set forth in the ruling letter have been satisfied, the ruling will be applied
> to the transaction.

Id. § 177.9(b)(1).

The Court has already found that ICP submitted the necessary material facts

regarding white sauce—accompanied by an actual sample of the product—to Customs

when seeking the Ruling Letter.  ICP also informed Customs of its belief that a prior

ruling letter had been issued for white sauce, as required by § 177.2(b)(5).

The Court therefore concludes that ICP correctly followed the ruling request

procedures set out in section 177.2 of Title 19 of the Code of Federal Regulations, and

that the Ruling Letter issued by CBP was not void *ab initio*.

2.       The Ruling Letter Applied to the Entry

The Court concludes that the Ruling Letter applied to the Entry because the

white sauce contained in the Entry materially conformed to the description in the

Ruling Letter.

> Ruling letters, when issued, apply to a particular class of merchandise:
>
> [e]ach ruling letter setting forth the proper classification of an article . . . will
> be applied only with respect to transactions involving articles identical to the
> sample submitted with the ruling request or to articles whose description is
> identical to the description set forth in the ruling letter.

Id. § 177.9(b)(2).

The Court has found that the white sauce contained in the Entry conformed to

the product described in the Ruling Letter and to the sample of white sauce provided to

Customs with the Ruling Request, and was therefore within the particular class of

merchandise to which the Ruling Letter applied. The Court therefore concludes that

Customs violated its own regulation at 19 C.F.R. § 177.2(b)(2) when it decided not to

apply the Ruling Letter to the Entry, despite the conformance of the Entry.

   3.    <u>The Notice of Action in Effect Revoked the Ruling Letter Contrary to Law</u>

The Court concludes that the Notice of Action was tantamount to an interpretive

ruling issued contrary to law, as it had the effect of revoking the Ruling Letter without

the notice and comment procedures required by 19 U.S.C. § 1625(c)(1) by liquidating the

Entry under a different HTSUS subheading than specified in the Ruling Letter.

The Court has already held that the Notice of Action was an "interpretive ruling

or decision" within the meaning of 19 U.S.C. § 1625(c)(1) and that, subject to proof at

trial, Customs effectively revoked the Ruling Letter contrary to law by "its conduct in

connection with the white sauce importations." ICP III, 549 F. Supp. 2d at 1393-94. The

Court here reaffirms this earlier determination and fully incorporates it into the current

opinion. Having found that Customs rate-advanced the Entry without following the

*International Custom Products, Inc. v. United States*                Page 49
Court No. 07-00318

procedures required by 19 U.S.C. § 1625(c)(1), the Court concludes that Customs acted

unlawfully.

    4.    Plaintiff Is Entitled to a Remedy

    As to the question of the appropriate remedy, the Court concludes that Plaintiff

is entitled to: (1) a declaration that the liquidation of the Entry contrary to 19 U.S.C.

§ 1625(c)(1) is void; and (2) a judgment requiring Customs to reliquidate the Entry at the

rate specified in the Ruling Letter and refund any excess duties to ICP with interest.

    It is important be mindful that the Court is not called on here to determine the

proper classification of ICP's white sauce *de novo*. The Court is instead faced with the

question of whether Customs violated ICP's right to notice and comment procedures,

contained in 19 U.S.C. § 1625(c)(1), when Customs refused to apply a lawfully-obtained,

applicable Ruling Letter to the Entry. Because the Court has determined that Customs

violated its legal obligation to classify the Entry according to the Ruling Letter, the

appropriate remedy is one tailored to cure that breach of law. It is thus appropriate to

declare Customs's rate-advance of the Entry to be void, and to require that Customs

apply the Ruling Letter to the Entry as it should have done initially. This can be

accomplished by requiring Commerce to reliquidate the Entry at the rate specified in

the Ruling Letter and to refund any overpayments, along with interest covering the

time of ICP's overpayment to the time the Court's judgment is satisfied.

### VII. Remaining Issues

Several minor issues remain: Plaintiff's motion seeking an adverse inference

based on Defendant's alleged spoliation of a white sauce sample; Defendant's motion to

disqualify Plaintiff's counsel; and Defendant's motion to strike certain portions of

Plaintiff's Post-Trial Brief.

First, The Court need not reach the questions of whether Defendant spoliated

evidence or whether Plaintiff would be entitled to an adverse inference on that basis, as

the Court has concluded as a factual matter that the white sauce in the entry materially

conformed to the Ruling Letter on the basis of the trial record. An adverse inference is

therefore unnecessary, and Plaintiff's motion is denied as moot.

Similarly, Defendant's motion to disqualify Plaintiff's counsel is denied as moot,

as Mr. Teufel did not testify or ask to testify at trial.

Finally, Defendant's motion to strike certain portions of Plaintiff's Post-Trial Brief

is granted. In its Post-Trial Brief, Plaintiff referenced certain purported evidence that

Plaintiff attempted to introduce at trial and which the Court excluded by sustaining an

evidentiary objection from Defendant. As such, these purported facts were not in

evidence and cannot be considered by the Court. The Court therefore strikes the
references to these matters from page 9 of Plaintiff's Post-Trial Brief, and has ignored
this text in issuing this decision.

## VIII. CONCLUSION

For the foregoing reasons, the Court determines that: (a) the Ruling Letter was
not obtained by material misrepresentation; (b) the Ruling Letter was therefore valid
and binding on Customs at the time of the Entry; (c) the white sauce in the Entry
materially conformed to the Ruling Letter; (d) Customs improperly liquidated the white
sauce contrary to the Ruling Letter by means of the Notice of Action; (e) the Notice of
Action had the effect of unlawfully revoking the Ruling Letter contrary to the
requirements imposed by 19 U.S.C. § 1625(c)(1), and (f) Plaintiff is therefore entitled to
reliquidation of the Entry at the rate established by the Ruling Letter.

Pursuant to USCIT Rule 54(b), "[w]hen an action presents more than one claim
for relief . . . the court may direct entry of a final judgment as to one or more, but fewer
than all, claims . . . only if the court expressly determines that there is no just reason for
delay." The Court determines that Plaintiff is entitled to all of the relief it seeks based
on the outcome of its 19 U.S.C. § 1625(c)(1) claim, and that there is thus no just reason to
delay entry of judgment.

*International Custom Products, Inc. v. United States*                               Page 52
Court No. 07-00318

Because the Court finds that Plaintiff is entitled to full relief based on its 19 U.S.C.

§ 1625(c)(1) claim, the Court need not reach Plaintiff's due process claim or bifurcated

19 U.S.C. § 1625(c)(2) "prior treatment" claim at this time. Those claims remain

dormant pending the outcome of any appeals. Should the Court's judgment on the

19 U.S.C. § 1625(c)(1) claim be disturbed, Plaintiff may seek further relief on its other

claims as appropriate.

Final judgment on the 19 U.S.C. § 1625(c)(1) claim will issue accordingly.

In accordance with the foregoing, it is hereby

**ORDERED** that Plaintiff's motion for an adverse inference based on spoliation of

evidence is denied as moot;

**ORDERED** that Defendant's motion to disqualify Plaintiff's counsel is denied as

moot; and it is further

**ORDERED** that Defendant's Motion to Strike portions of Plaintiff's Post-Trial

Brief is granted.

> /s/Gregory W. Carman
> Gregory W. Carman

Dated:  November 20, 2012
         New York, NY

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| INTERNATIONAL CUSTOM PRODUCTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | **Before: Gregory W. Carman, Judge** <br><br> Court No. 07-00318 |

## JUDGMENT

In accordance with the Court's Slip Opinion in this matter issued on this date, and upon the Court's express determination, pursuant to USCIT Rule 54(b), that there is no just reason for delay, it is hereby

**ORDERED, ADJUDGED, and DECREED** that the Bureau of Customs and Border Protection acted contrary to the requirements imposed by 19 U.S.C. § 1625(c)(1) in refusing to apply a binding ruling letter, D86228, to Plaintiff's merchandise in entry 180-0590029-7; and it is further

**ORDERED** that Customs reliquidate entry 180-0590029-7 at the tariff rate established by 2103.90.9091, HTSUS, as specified in ruling letter D86228; and it is further

**ORDERED** that Customs refund to Plaintiff any overpayment, with interest.

          /s/Gregory W. Carman
          Gregory W. Carman, Judge

Dated: November 20, 2012
    New York, New York

<u>CERTIFICATE OF SERVICE</u>

Edward F. Kenny hereby certifies under penalty of perjury that on this 14th day of June, 2013, a copy of the foregoing Brief for Appellee, United States was filed electronically.

This filing was served electronically to all parties by operation of the Court's electronic filing system.


<u>/s/ Edward F. Kenny</u>

## **CERTIFICATE OF COMPLIANCE PURSUANT TO FRAP 32(a)(7)(C)**

_____

Appeal 2013-1176
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT
_____

INTERNATIONAL CUSTOM PRODUCTS, INC.,
Plaintiff/Appellee,

v

UNITED STATES,
Defendant/Appellant.

I, Edward F. Kenny, a trial attorney in the Office of the Assistant

Attorney General, Civil Division, Commercial Litigation Branch,

International Trade Field Office, who is responsible for the foregoing brief,

relying upon the Microsoft Word word count, certify that this brief complies

with the type-volume limitation under Rule 32(a)(7)(B), and contains 7,687

words.

/s/ Edward F. Kenny